**James Lee DOWER**

v.

**DIRECTOR, PATUXENT.**

**Bernard Howard BROOKS**

v.

**Harold BOSLOW.**

**Duane Alan CARL**

v.

**DIRECTOR OF PATUXENT INSTITUTION.**

**Albert E. HAWKINS C–1363**

v.

**Harold M. BOSLOW, Director of Patuxent.**

Civ. Nos. 73–577–K, 73–143–K, Case B, 73–334–K, Case B, and 73–1158–K.

United States District Court, D. Maryland.

May 8, 1975.

Karl G. Feissner, Hyattsville, Md., for plaintiff Dower.

Bernard Howard Brooks pro se.

Duane Alan Carl pro se.

Albert E. Hawkins pro se.

Francis B. Burch, Atty. Gen. of Md., John P. Stafford, Jr., and Donald R. Stutman, Asst. Attys. Gen., for defendants.

FRANK A. KAUFMAN, District Judge.

Dower, Brooks, Carl and Hawkins, all presently confined at the Patuxent Institution, seek habeas corpus relief in these cases. Each has been convicted by the Courts of the State of Maryland of one or more felonies,[1] and each has been adjudicated a "defective delinquent"[2] as

1. Dower was convicted on February 22, 1971, after a non-jury trial before Judge J. Harold Grady sitting in the Criminal Court of Baltimore, of assault with intent to murder, assault with intent to rob and possession of a deadly weapon. He was sentenced to a term of confinement of ten years on each of the first two charges and to a term of confinement of two years on the third charge, the three sentences to be served concurrently. On November 23, 1971, the Court of Special Appeals of Maryland affirmed Dower's said convictions. No further direct appellate review was sought by Dower.

Brooks pleaded guilty on April 23, 1971 to a charge of robbery and was sentenced to a term of confinement of six years by Judge Anselm Sodaro sitting in the Criminal Court of Baltimore.

Carl pleaded guilty to a charge of "daytime housebreaking" on May 8, 1972 and was sentenced to a term of confinement of seven years by Judge Kenneth C. Proctor sitting in the Circuit Court for Baltimore County.

Hawkins was convicted on November 11, 1969, after a non-jury trial, of "violation of the narcotics laws" and was sentenced to a term of confinement of four years by Judge Joseph L. Carter sitting in the Criminal

Court of Baltimore. On April 16, 1971, the Court of Special Appeals of Maryland affirmed Hawkins' conviction and on May 3, 1971 certiorari review was denied by the Court of Appeals of Maryland. Hawkins v. State, 261 Md. 725, cert. denied, 404 U.S. 944, 92 S.Ct. 296, 30 L.Ed.2d 260 (1971).

2. Dower was determined to be a defective delinquent on November 28, 1972 after a jury trial in the Criminal Court of Baltimore, Judge Paul A. Dorf presiding. No appellate review was sought by Dower.

Brooks was determined to be a defective delinquent on July 31, 1972 after a jury trial in the Criminal Court of Baltimore, Judge C. Burnam Mace presiding. No appellate review was sought by Brooks.

Carl was determined to be a defective delinquent on November 2, 1973 after a jury trial in the Circuit Court for Baltimore County, Judge Lester L. Barrett presiding. Application for leave to appeal from that determination was denied by the Court of Special Appeals of Maryland on December 18, 1973.

Hawkins was determined to be a defective delinquent on December 17, 1971 after a non-jury trial before Judge Robert B. Watts, sit-

that term is used in 3 Md.Ann.Code art. 31B, § 5 (1971 Repl. Vol.).[3] In the within four cases,[4] each plaintiff seeks habeas corpus relief alleging that his original commitment to, and his continued confinement at, Patuxent is in violation of his constitutional rights.

Plaintiffs raise three primary contentions herein.[5] First, they allege that their rights under due process and equal protection principles were violated when Patuxent officials failed to inform them of their "rights" before their examinations at Patuxent and also when those officials failed to respect those rights during the course of those examinations. The rights that plaintiffs claim they are entitled to have during the examination process include the right to counsel, the right to remain silent, and the right to assert, and to have respected, the privilege against self-incrimination.[6]

Second, plaintiffs allege that their due process rights were violated because the standard of proof which the State was required to meet at their delinquency determination hearings was the "preponderance of the evidence" test rather than either the "proof beyond a reasonable doubt" or the "proof by clear and convincing evidence" standard. Finally, plaintiffs allege that they were not afforded their rights under the Equal Protection Clause when the criteria, procedures and treatment afforded to them under the Maryland Defective Delinquency Act, 3 Md.Ann.Code art. 31B, §§ 1–19 (1973 Cum.Supp.) are—

> * * * considered in relation to the criteria, procedures, and treatment that the State of Maryland makes available to other persons, not "defective delinquents," committed for compulsory psychiatric treatment. * * *[7]

ting in the Criminal Court of Baltimore. Application for leave to appeal from that determination was denied by the Court of Special Appeals of Maryland on November 9, 1972.

3. That section provides:
 For the purposes of this article, a defective delinquent shall be defined as an individual who, by the demonstration of persistent aggravated antisocial or criminal behavior, evidences a propensity toward criminal activity, and who is found to have either such intellectual deficiency or emotional unbalance, or both, as to clearly demonstrate an actual danger to society so as to require such confinement and treatment, when appropriate, as may make it reasonably safe for society to terminate the confinement and treatment.

4. Dower has not previously sought habeas corpus relief in this Court. Brooks' first quest for habeas corpus relief was denied by this Court in Brooks v. Director, Patuxent, Civil No. 73–143–HM, Case A (D.Md. April 17, 1973). Carl's first quest for habeas corpus relief was denied by this Court in Carl v. State of Maryland, Civil No. 73–334–HM, Case A (D.Md. April 11, 1973). Carl's third quest for habeas corpus relief (this is his second) was denied by this Court in Carl v. State of Maryland, Civil No. 73–334–HM, Case C (D.Md. May 1, 1974). Hawkins' first quest for habeas corpus relief was denied by this Court in Hawkins v. Director, Patuxent

Institution, Civil No. 14583 (D.Md. Aug. 15, 1963), appeal dismissed No. 9156 (4th Cir. Sept. 24, 1963).
 The contentions presently raised by plaintiffs in these four cases were seemingly not presented or considered either on the merits or otherwise in any of the proceedings referred to above in this n. 4.

5. Carl also appears to be challenging in Civil No. 73–334–K, Case B the sufficiency of the evidence against him at his defective delinquency determination hearing. In view of this Court's determination *infra* as to Carl, that contention need not be reached herein.

6. Plaintiffs also claim that in view of the provision of some of those rights to civil committees under Maryland law, they must be made available to persons committed to Patuxent for examination, under equal protection principles. However, assuming *arguendo* the accuracy of plaintiffs' said assertion, there is no stage of the civil commitment process in Maryland which would appear to be substantially similar to the institution-examination process at Patuxent which precedes the defective delinquency determination hearing. Accordingly, plaintiffs' equal protection claims in that regard may not prevail. Plaintiffs' other equal protection claims are discussed *infra*.

7. Murel v. Baltimore City Criminal Court, 407 U.S. 355, 357–58, 92 S.Ct. 2091, 32 L.Ed. 2d 791 (1972).

In Sas v. State of Maryland, 334 F. 2d 506 (4th Cir. 1964), Judge Bell, writing for the Fourth Circuit, held: (1) (at 509, 513, 516) Maryland's statutory definition of a "defective delinquent" was facially constitutional; (2) (at 514) the Maryland Defective Delinquency Act by creating a class of "defective delinquents" did not facially violate the Equal Protection Clause; and (3) (at 515–16) on its face that Act provided adequate procedural safeguards to protect the procedural due process rights of persons committed to Patuxent. However, Judge Bell cautioned (at 517):

> The creation of a non-medically determinable category of persons who may be confined for indeterminate periods by a civil proceeding is so serious a departure from traditional concepts of justice that it deserves a critical analysis on the broadest of terms after a careful factual development of its present operation. * * *

Accordingly, in Sas, the Fourth Circuit remanded so that this Court could "determine whether the statute is being constitutionally applied" (at 509).

Thereafter, following detailed and lengthy presentation by counsel and consideration not only of such presentation but also of the record of extensive proceedings in the Courts of the State of Maryland,[8] Judge Watkins of this Court in a lengthy, thoughtful opinion found as a fact, and concluded as a matter of law:

> * * * that the Maryland Act is not only constitutional on its face, but also in its interpretation, application, and results. [Footnote omitted.]

Sas v. State of Maryland, 295 F.Supp. 389, 420 (D.Md.1969).

On appeal, sub nom. Tippett[9] v. State of Maryland, 436 F.2d 1153 (4th Cir. 1971), Chief Judge Haynsworth, in addition to considering the history, operation and methodology of Patuxent, specifically affirmed (at 1155) on the basis of Judge Watkins' opinion. However, footnote 18 of Judge Haynsworth's opinion (at 1158) reads:

> We do not suggest that our disposition of these cases should be taken as a final and unalterable evaluation of all Constitutional questions which may arise out of the Act's administration. We would not consider ourselves bound by today's decision in a future case if later experience should show serious unfairness in the administration of the Act.

Judge Sobeloff, concurring in part and dissenting in part, noted (at 1159) that he was able to concur in part largely because of the reservation found in the aforementioned footnote 18 to the majority opinion. Judge Sobeloff dissented (at 1159–66) on the issues of right to counsel and standard of proof. The Supreme Court, after granting a writ of certiorari, sub nom. Murel v. Baltimore City Criminal Court, 404 U.S. 999, 92 S.Ct. 567, 30 L.Ed.2d 552 (1971), subsequently, in a per curiam opinion, withdrew that grant "as improvidently granted". Murel v. Baltimore City Criminal Court, 407 U.S. 355, 358, 92 S.Ct. 2091, 32 L.Ed.2d 791 (1972).[10] In

---

8. See Director of Patuxent Institution v. Daniels, 243 Md. 16, 221 A.2d 397 (1966), referred to repeatedly by Judge Watkins in Sas v. Maryland, 295 F.Supp. 389 (D.Md. 1969).

9. Sas himself, having been released from Patuxent, did not join in the appeal. Tippett v. State of Maryland, 436 F.2d 1153, 1154 n. 1 (4th Cir. 1971).

10. In Murel (407 U.S. at 357, 92 S.Ct. at 2092), the majority per curiam opinion stated:

> Of the four petitioners, one has been unconditionally released from confinement, and the other three are subject to criminal sentences that have not yet expired, and that would bar their release from custody even if their claims were to prevail. This fact, while not necessarily dispositive of all the claims presented by these petitioners, casts those claims in a different light, not contemplated by our original grant of the writ. * * * [Footnotes omitted.]

its said per curiam opinion, however, the Court indicated (at 357–58, 92 S.Ct. 2091) that the Defective Delinquency Act should be considered in relation to the provisions that Maryland makes available for the compulsory commitment of persons who are not "defective delinquents". Mr. Justice Douglas dissented on the grounds that the "beyond a reasonable doubt" standard of burden of proof, and not, as is now the case, the "preponderance of the evidence" standard, should govern defective delinquency determinations.

On the same day that the *Murel* per curiam opinion was filed, the Supreme Court also decided McNeil v. Director, Patuxent Institution, 407 U.S. 245, 92 S.Ct. 2083, 32 L.Ed.2d 719 (1972). Mr. Justice Marshall (at 250–51, 92 S.Ct. at 2087) referred to, but stated that he was "putting that claim to one side", the fact that McNeil urged that he had a Fifth Amendment right to withhold cooperation. That comment followed Mr. Justice Marshall's earlier comment (at 247–48, 92 S.Ct. 2083) that "for various reasons" the Supreme Court had declined to reach in *Murel* questions concerning criteria and procedures underlying commitment to Patuxent. In so doing, the Justice observed that the Court had before it in *McNeil* "a much more stark and simple claim" and that McNeil was entitled to his release from confinement because he had never had a defective delinquency determination hearing and was being held at Patuxent after the expiration of his original criminal sentence solely on the basis of an *ex parte* order committing him for examination in preparation for such a determination hearing, and his own refusal to cooperate in connection with such examination. Mr. Justice Douglas, concurring, indicated he would also have held that McNeil had a Fifth Amendment right to be silent in connection with his administrative examination prior to a defective delinquency determination (at 254–55, 92 S. Ct. 2083).

Petitioners seeking federal habeas corpus relief are usually required first to exhaust all of the state remedies available to them. However, "[e]xhaustion does not require an exercise in futility", Woodall v. Pettibone, 465 F.2d 49, 51 (4th Cir. 1972), and thus does not require a federal habeas corpus petitioner first to seek relief in the Courts of Maryland when it is apparent in advance that such relief will be denied. Since the requirement of exhaustion is not a jurisdictional concept but simply a flexible matter of comity, Jenkins v. Fitzberger, 440 F.2d 1188, 1189 (4th Cir. 1971); Williams v. Coiner, 392 F.2d 210, 213 n. 2 (4th Cir. 1968), and since each of the three contentions which plaintiffs raise herein has already been finally decided adversely to them in the Maryland Courts,[11] there is no need for them to pursue further their state remedies.

11. The right to counsel issue was seemingly decided in Wise v. Director, 1 Md.App. 418, 421–22, 230 A.2d 692 (1967), cert. denied sub nom. Wise v. Boslow, 390 U.S. 1030, 88 S.Ct. 1420, 20 L.Ed.2d 286 (1968), quoted in Sas v. Maryland, 295 F.Supp. at 409–10, *supra*. The right to remain silent and the right against self-incrimination were considered in McDonough v. State, 253 Md. 547, 551, 253 A.2d 517 (1969). The standard of proof and equal protection contentions were considered in Bush v. Director, 22 Md.App. 353, 324 A.2d 162 cert. denied (Oct. 24, 1974).

Additionally, pursuant to the teaching of Jenkins v. Fitzberger, *supra*, this Court takes into account that counsel for the defendants herein, in a communication to this Court dated October 8, 1974 and placed in the official court file in Civil No. 73–577–K, indicated that they did not wish to raise any exhaustion issue. It is also to be noted that relief under Maryland's Post Conviction Procedure Act is seemingly not available in connection with procedures involving Patuxent. *See* Gee v. Director, 513 F.2d 814 (4th Cir. 1975); John Paul Jones v. Director, No. 13,-041 (4th Cir. Aug. 13, 1969); Towers v. Director, 16 Md.App. 678, 299 A.2d 461 (1973); Creswell v. Director, 2 Md.App. 142, 233 A.2d 375 (1967). *See also* Hudson v. Superintendent, 11 Md.App. 253, 273 A.2d 470 (1971).

## I. DUE PROCESS—RIGHTS TO COUNSEL, TO REMAIN SILENT, AND CONCERNING SELF–INCRIMINATION, DURING THE PATUXENT EXAMINATION PROCESS

In *Sas*, Judge Watkins, discussing the right to counsel, wrote (295 F.Supp. at 409, *supra*) that—

> \* \* \* there are several reasons why failure to advise of a right to counsel, or to furnish counsel, is not a violation of rights in the institution—examination stage. The proceeding is not accusatorial; it is not designed to elicit evidence or proof of guilt, for the patient has already been convicted. The purpose is to determine the appropriate type of punishment or treatment. [Footnote omitted.]

In support thereof, Judge Watkins cited and discussed United States v. Albright, 388 F.2d 719 (4th Cir. 1968) (Winter, J.), in which the question arose as to whether a federal criminal defendant's right not to be compelled to incriminate himself was violated by requiring him to submit to a psychiatric examination, the results of which were used by the Government in opposition to the defense of insanity which had been advanced by the defendant. Judge Winter, holding that the defendant's rights were not so violated, wrote (at 723) that

> \* \* \* a defendant's right not to incriminate himself is not violated *per se* by requiring him, in an appropriate case, to submit to a mental examination. \* \* \*

Judge Watkins reasoned in *Sas* (at 411) that if a compulsory examination in a criminal case such as *Albright* wherein guilt had not yet been determined is not a violation of the right against self-incrimination, then examination at Patuxent as a prelude to a defective delinquency determination hearing does not constitute such a violation.

As to the right to remain silent, Judge Watkins noted in *Sas* (at 410–11):

> The proceedings before this Court establish, and this Court finds as a

fact, that no resort to punitive measures occurs when a person referred for examination refuses to answer questions or to submit to an examination. True, he is not permitted to engage in group therapy, since his status as a defective delinquent, for whom the treatment procedures of Patuxent are intended, has not been established, and the establishment of his status is indefinitely postponed, but as a result of his own conduct.

> As to procedure, this Court finds that in ordinary course a suspected defective delinquent is ordered to report for examination. If, on reporting, he states that he is represented by counsel, he is permitted to return to his cell, and no effort further to interrogate him is made, until he or his counsel indicates his willingness. If one not represented by counsel is ordered to report and does so, but states his unwillingness to answer questions or be examined, he is permitted to return to his cell. Thereafter he may be directed from time to time to report to his physician for examination. If he reports, and declines to answer, or be examined, no disciplinary action is taken. If he refuses to report he may be disciplined for failure to obey an order. [Footnote omitted.]

Referring again (at 411) to *Albright*, Judge Watkins held the Patuxent procedure "well within the limits" of Judge Winter's opinion therein.

Turning to a consideration of the right against self-incrimination issue, Judge Watkins commented in *Sas* (at 411):

> The absolute indispensability of a personal examination of one as to whom a mental appraisal is to be made seems incontestable \* \* \*. \* \* \* "[T]he purpose of the stage of the defective delinquent proceeding that is being attacked herein is not to determine or to gain evidence to prove that the subject has committed a crime, but rather to discover the

inmate's mental and emotional condition." [Quoting in part from Wise v. Director, 1 Md.App. at 422, 230 A.2d 692, *supra*; footnotes omitted.]

In sum Judge Watkins found that the Patuxent procedures did not offend the constitutional rights against self-incrimination of Patuxent's inmates.

In *Tippett, i. e.*, upon review of Judge Watkins' opinion in *Sas*, Chief Judge Haynsworth wrote (436 F.2d at 1158, *supra*):

> The approach of Maryland's Defective Delinquent Act is essentially a medical approach, but the clear promise it has demonstrated would be withdrawn should it be held, as the petitioners contend, that the diagnostic and treatment processes must be converted into an adversary legal process in which the patient is entitled to all the constitutional protections available to a defendant in a criminal proceeding. It is difficult to imagine anything more stultifying to a psychiatrist, as dependent as he is upon the cooperation of his patient, than the presence of a lawyer objecting to the psychiatrist's questions and advising his client not to answer this question and that. The injection of broad legal restraints into the diagnostic and treatment procedures that would deny Patuxent's substantial prospect for improvement over our earlier practices might well restrain most other experimentation looking toward conversion of our correctional institutions into effective rehabilitating agencies.

> The suggestion in the dissenting opinion that counsel be brought into the proceedings to a limited extent at an earlier time, like our similar suggestion with respect to the private psychiatrist, may have merit as one for future trial and experimentation.

Its concededly tentative nature, in light of the uncertainties permeating this field of knowledge, however, hardly leads to the conclusion that it presently is an absolute requirement of the due process clause. The question before us is whether the procedures embodied in the statute meet the minimal requirements of the Constitution. In the appraisal of that question, settled notions of the essential elements of fairness play a great part, but the fact that we can conceive of tentative avenues for future trial experimentation to determine their impact upon the fairness of the procedures does not support a conclusion that our hesitant suggestions are already clad in the full regalia of due process. [Footnote omitted.]

Although Chief Judge Haynsworth seemingly did not in *Tippett* specifically address himself to the privilege against self-incrimination issue, he did note (at 1155), near the commencement of his opinion, that that question was before the Court. Judge Sobeloff, in his concurring and dissenting opinion in *Tippett* stated (at 1162):

> With the continuing reservation that this issue is open to further consideration, I agree, for the present, that the right against self-incrimination cannot be rigidly applied in Patuxent proceeding. I rest, however, not on the asserted ground that the Act is "civil" but that, because of the unusual nature of the necessary inquiries, the legitimate objectives of the legislation would be frustrated were inmates permitted to refuse cooperation. Granting the inmate the right to silence would in many instances thwart the personal examinations and interviews considered indispensable in determining whether the prisoner is or is not a defective delinquent.[12] [Footnote omitted.]

---

12. Judge Sobeloff also noted (at 1161 n. 6):
It needs to be emphasized that the prisoner is asked to speak of his past in order to gain an insight into his personality, his mind and his emotions, not to entangle

him in any criminal prosecution. The District Court expressed a proper concern that disclosures of criminal acts by the inmate might lead to new charges. The court suggested that in such a case the exclu-

As to the right to counsel issue, Judge Sobeloff (at 1163–64) expressed his dissenting view as follows:

\* \* \* [T]he record compiled by the staff embodies an accumulation of information some of which may be of doubtful reliability. The inmate's background is by the staff's own admission one of the most important factors, if not the single most important factor, in diagnosing the inmate. If the history is inaccurate, the medical evaluation is liable to be incorrect. There must be an early opportunity for counsel to question the contents of the inmate's dossier to avert the danger of a vital staff recommendation being founded on false data.

\* \* \* \* \* \*

The retained or appointed counsel should consult with the prisoner as soon as practicable after his admission to the Institution. I would not insist that counsel be present during the individual psychiatric examinations, but counsel should be allowed access to the information concerning the prisoner's history as it is assembled. When the inmate is admitted into the final conference for questioning by the staff, counsel should be allowed to attend, to interrogate his client in order to clarify matters in dispute, and to make a statement on his client's behalf. \* \*

\* \* \* \* \* \*

The above suggestions with respect to the right of counsel are advanced tentatively. If adopted, they should be deemed, like other conclusions of mine and the majority's own holdings, subject to review and reconsideration from time to time as experience dictates.

■ Against that background, the first contention of plaintiffs herein of due process violations resting upon the fact that Patuxent, in accordance with its procedures, did not afford to plaintiffs herein privileges of silence and against self-incrimination and right to counsel during their examinations and consultations of a psychiatric nature undertaken as a prelude to an administrative determination of defective delinquency and to a court trial thereafter with regard to the existence of such status, provides no basis for habeas corpus relief in a district court within the Fourth Circuit.

## II. DUE PROCESS—STANDARD OF PROOF

The standard of proof in defective delinquency proceedings is the preponderance of the evidence standard. Sas v. State of Maryland, 334 F.2d supra, at 511 and cases cited thereat. See also, e. g., Crews v. Director, 245 Md. 174, 180, 225 A.2d 436 (1967); Purks v. State, 226 Md. 43, 46, 171 A.2d 726 (1961); Bush v. Director, 22 Md.App. 353, 355–60, 324 A.2d 162, cert. denied —— Md. —— (Oct. 24, 1974).

In Sas v. Maryland, 334 F.2d supra, Judge Bell, in answering petitioners' objections to the Defective Delinquency Act on the grounds that, inter alia, " \* \* \* the statute provides that the state must carry its case only by the

---

sion at any subsequent criminal trial of the inmate's admissions would suffice to protect his constitutional rights. I agree with the court's concern, but would go further. Not only should such disclosures be inadmissible in any criminal proceeding, but they ought not become the predicate for further investigation leading to a prosecution. I would insist that the prisoner is entitled to complete immunity in respect to matters he is compelled to disclose.

There is an additional complication where the prisoner has pending an appeal from his conviction. In no event should any information divulged or evidence developed from information divulged be admissible against the prisoner if a new trial is awarded.

These matters need not be further pursued since they are not now before us.

greater weight of the evidence", wrote (at 515):

> \* \* \* The answer to all of these objections is that with respect to state action repeated decisions of the Supreme Court have put it beyond the range of further debate that the "due process" clause of the fourteenth amendment has not the effect of imposing upon the states any particular form or mode of procedure, so long as the essential rights of notice and a hearing, or opportunity to be heard, before a competent tribunal are not interfered with. \* \* \*

Considering in *Tippett* (at 1155) the contention that the standard of proof in a defective delinquency hearing should be the "beyond a reasonable doubt" criterion, Chief Judge Haynsworth wrote (at 1158–59):

> The burden of persuasion is in the same category. We might all be happier had it been stated in terms of clear and convincing proof rather than in terms of a preponderance of the evidence. However meaningful the distinction may be to us as judges, however, it is greatly to be doubted that a jury's verdict would ever be influenced by the choice of one standard or the other. We all know that juries apply the preponderance standard quite flexibly, depending upon the nature of the case. In any event, in the present state of our knowledge, choice of the standard of proof should be left to the state. A legislative choice of the preponderance standard, *the same standard governing civil commitments of mentally ill persons who have*

*no history of criminality,* ought not to be held in violation of due process requirements when we have no firm foundation for an evaluation of the practical effects of the choice. [Emphasis supplied.]

Judge Sobeloff, noting (at 1165) that the Supreme Court in Woodby v. Immigration and Naturalization Service, 385 U.S. 276, 285, 87 S.Ct. 483, 17 L.Ed.2d 362 (1966), had, for use in deportation hearings. "fashioned an intermediate standard of 'clear, unequivocal, and convincing evidence,' " expressed the view (at 1166) that "[t]he Court's approach in *Woodby* seems to be suitable for defective delinquency hearings" and would appear required as a minimum standard in connection therewith.[13]

As indicated *supra,* the standard of proof issue was discussed by the Supreme Court in its majority per curiam opinion in *Murel.* In that case, also, Mr. Justice Douglas in dissent indicated that he would have reversed *Tippett* on the standard of proof issue citing not only *Woodby* but also Rosenbloom v. Metromedia, Inc., 403 U.S. 29, 91 S.Ct. 1811, 29 L.Ed.2d 296 (1971), in which Mr. Justice Brennan wrote in a plurality opinion (at 52, 91 S.Ct. at 1824):

> \* \* \* We \* \* \* hold that a libel action \* \* \* [concerning] an event of public or general concern may be sustained only upon clear and convincing proof that the defamatory falsehood was published with knowledge that it was false or with reckless disregard of whether it was false or not. \* \* \* [Footnote omitted.] [14]

---

13. Judge Sobeloff wrote (at 1165) that he did not believe that a more stringent standard was required:

It must be recognized, however, that as to the *ultimate* issue of the inmate's dangerousness, the beyond a reasonable doubt standard may in practical operation be too onerous. After all, the ultimate issue is not as in a criminal case whether an alleged act was committed or event occurred, but the much more subjective issue of the individual's mental and emo-

tional character. Such a subjective judgment cannot ordinarily attain the same "state of certitude" demanded in criminal cases. A number of commentators have suggested that a standard lying between the civil and the criminal may suffice where a determination of "dangerousness" is at issue. Frequently advocated is a standard of "clear and convincing evidence." [Emphasis in original; footnote omitted.]

14. *Cf.* Gertz v. Robert Welch, Inc., 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974).

Mr. Justice Douglas wrote (407 U.S. at 365, 92 S.Ct. 2091) in his opinion in *Murel* that in a Patuxent defective delinquency determination setting, the "beyond a reasonable doubt" standard was the required test.

■ Under III, *infra,* this Court concludes that as to the plaintiff Carl, but not as to the other three plaintiffs, Maryland's use of the preponderance of the evidence standard violated equal protection principles. That holding makes it unnecessary for this Court to determine the due process issue posed by Maryland's use of that standard, insofar as Carl is concerned, but not insofar as the other three plaintiffs are concerned. As to them that due process issue must be faced and determined herein. The difficulties involved in the resolution of that issue are well illustrated by the above-discussed views of Chief Judge Haynsworth and Judge Sobeloff in their respective opinions in *Tippett.* But, as of today, in the light of the existing opinions of the Supreme Court and of the Fourth Circuit and particularly in the light of Chief Judge Haynsworth's statement for the Court in *Tippett* (at 1159) that a legislative choice of the preponderance of the evidence standard is not violative of due process, Maryland's utilization of the preponderance of the evidence test must be held to pass federal constitutional muster insofar as due process considerations are concerned.

### III. EQUAL PROTECTION—STANDARD OF PROOF

But additional considerations with regard to standard of proof are posed by plaintiffs' equal protection challenge, in view of recent developments in Maryland as to commitment of mentally disordered and retarded persons. In its per curiam opinion in Murel v. Baltimore City Criminal Court, 407 U.S. *supra,* the Supreme Court, in the course of discussing the writ of certiorari "as improvidently granted", directed (at 357–58, 92 S.Ct. at 2092):

Under our decisions in Baxstrom v. Herold, 383 U.S. 107 [86 S.Ct. 760, 15 L.Ed.2d 620] (1966), Humphrey v. Cady, 405 U.S. 504 [92 S.Ct. 1048, 31 L.Ed.2d 394] (1972), and Jackson v. Indiana, 406 U.S. 715 [92 S.Ct. 1845, 32 L.Ed.2d 435] (1972), petitioners' challenge to the Maryland Defective Delinquency Law should be considered in relation to the criteria, procedures, and treatment that the State of Maryland makes available to other persons, not "defective delinquents," committed for compulsory psychiatric treatment. We are informed that the statutes governing civil commitment in Maryland are presently undergoing substantial revision, designed to provide greater substantive and procedural safeguards to committed persons. Accordingly, it seems a particularly inopportune time for this Court to consider a comprehensive challenge to the Defective Delinquency Law.

Baxstrom v. Herold, 383 U.S. 107, 86 S.Ct. 760, 15 L.Ed.2d 620 (1966), was a unanimous decision [15] which related to the civil commitment to a state mental hospital under the jurisdiction of and operated by the New York Department of Corrections, of an insane prisoner at the expiration of his sentence upon a criminal conviction. New York law provided a *de novo* jury trial for all civil committees except for those committed, at the expiration of a criminal sentence, to the aforesaid state hospital. Mr. Chief Justice Warren wrote (at 110, 86 S.Ct. at 762):

We hold that petitioner was denied *equal protection* of the laws by the statutory procedure under which a person may be civilly committed at the expiration of his penal sentence without the jury review available to all other persons civilly committed in New York. Petitioner was further denied *equal protection* of the laws by his civil commitment to an institution maintained by the Department of Correction beyond the expiration of his

---

15. Mr. Justice Black concurred in the result.

prison term without a judicial determination that he is dangerously mentally ill such as that afforded to all so committed except those, like Baxstrom, nearing the expiration of a penal sentence. [Emphasis supplied.]

The Chief Justice concluded (at 111–12, 86 S.Ct. at 763):

\* \* \* For purposes of granting judicial review before a jury of the question whether a person is mentally ill and in need of institutionalization, there is no conceivable basis for distinguishing the commitment of a person who is nearing the end of a penal term from all other civil commitments.

In Humphrey v. Cady, 405 U.S. 504, 92 S.Ct. 1048, 31 L.Ed.2d 394 (1972), the defendant, convicted of contributing to the delinquency of a minor, a misdemeanor punishable by a maximum sentence of one year, was committed, in lieu of sentence, to a "sex deviate facility" for a potentially indefinite time pursuant to the Wisconsin Sex Crimes Act. That statute provided that if the prosecution establishes at a post-trial hearing that a convicted defendant is in need of specialized treatment for his "mental and physical aberrations", the Court at the time of sentencing must commit him for such treatment for a period equal to the maximum sentence authorized for the crime for which the defendant has been committed. At the end of that period, the defendant may be committed for another five years if the Court finds, in ′a proceeding in which a jury trial is not available to the person involved, that his release would be "dangerous to the public because of [his] mental or physical deficiency, disorder or abnormality". 405 U.S. *supra* at 507, 92 S.Ct. at 1051. Further, additional five-year extensions may be imposed without limitation. Humphrey claimed that his commitment, at least after the expiration of his original sentence, was essentially equivalent to compulsory civil commitment, a procedure in connection with which Wisconsin provided a statutory right to a jury trial before commitment and that therefore the denial of a jury trial to him at the time of any extension of commitment denied him equal protection.

Writing in *Humphrey* for a unanimous Court [16] Mr. Justice Marshall first discussed *Baxstrom* (at 508, 92 S.Ct. at 1051):

In Baxstrom, substantially the same argument was advanced by a convicted prisoner who was committed under New York law for compulsory treatment, without a jury trial, at the expiration of his penal sentence. This Court held that the State, having made a jury determination generally available to persons subject to commitment for compulsory treatment, could not, consistent with the *Equal Protection Clause*, arbitrarily withhold it from a few. 383 U.S., at 110–112 [86 S.Ct. at 762–763]. The Court recognized that the prisoner's criminal record might be a relevant factor in evaluating his mental condition, and in determining the type of care and treatment appropriate for his condition; it could not, however, justify depriving him of a jury determination on the basic question whether he was mentally ill and an appropriate subject for some kind of compulsory treatment. [Emphasis supplied.]

And continuing (at 510–11, 92 S.Ct. at 1052), Mr. Justice Marshall added:

Respondent seeks to justify the discrimination on the ground that commitment under the Sex Crimes Act is triggered by a criminal conviction; that such commitment is merely an alternative to penal sentencing; and consequently that it does not require the same procedural safeguards afforded in a civil commitment proceeding. That argument arguably has force with respect to an initial commitment under the Sex Crimes Act,

---

16. Mr. Justice Powell and Mr. Justice Rehnquist took no part in the consideration or decision.

which is imposed in lieu of sentence, and is limited in duration to the maximum permissible sentence. The argument can carry little weight, however, with respect to the subsequent renewal proceedings, which result in five-year commitment orders based on new findings of fact, and are in no way limited by the nature of the defendant's crime or the maximum sentence authorized for that crime. The renewal orders bear substantial resemblance to the post-sentence commitment that was at issue in Baxstrom. Moreover, the Wisconsin Supreme Court has expressly held that even the initial commitment under the Sex Crimes Act is not simply a sentencing alternative, but rather an independent commitment for treatment, comparable to commitment under the Mental Health Act. * * * [7]

7. Two courts of appeals have implied the contrary, see Matthews v. Hardy, 137 U.S.App. D.C. 39, 420 F.2d 607 (1969), cert. denied, 397 U.S. 1010 [90 S.Ct. 1231, 25 L.Ed.2d 423] (1970), and United States ex rel. Schuster v. Herold, 410 F.2d 1071 (C.A.2), cert. denied, 396 U.S. 847 [90 S.Ct. 81, 24 L.Ed.2d 96] (1969). This case does not present the claim of right to a jury trial at the initial commitment, however, and we intimate no view on that question here. * * *
* * * * *

Mr. Justice Marshall (at 510, 92 S.Ct. at 1052) noted that—

Commitment for compulsory treatment under the Wisconsin Sex Crimes Act appears to require precisely the same kind of determination, involving a mixture of medical and social or legal judgments. If that is so (and that is properly a subject for inquiry on remand), then it is proper to inquire what justification exists for depriving persons committed under the Sex Crimes Act of the jury determination afforded to persons committed under the Mental Health Act. [Footnote omitted.]

Subsequently (at 512, 92 S.Ct. at 1053), the Justice wrote:

An alternative justification for the discrimination might be sought in some special characteristic of sex offenders, which may render a jury determination uniquely inappropriate or unnecessary. It appears; however, that the Mental Health Act and the Sex Crimes Act are not mutually exclusive; that "aberrations" warranting commitment under the latter might also amount to "mental illness" warranting commitment under the former. The *equal protection* claim would seem to be especially persuasive if it develops on remand that petitioner was deprived of a jury determination, or of other procedural protections, merely by the arbitrary decision of the State to seek his commitment under one statute rather than the other. [Footnotes omitted; emphasis supplied.]

Accordingly, for those reasons and others set forth in the opinion in Humphrey v. Cady, the Supreme Court remanded for further proceedings in the federal district court in which Humphrey had unsuccessfully instituted his quest for habeas corpus relief.

Jackson v. Indiana, 406 U.S. 715, 92 S.Ct. 1845, 32 L.Ed.2d 435 (1972), involved the pre-trial commitment of a mentally defective deaf-mute charged with two robberies. Indiana law provided that if a trial judge prior to trial had reasonable ground to believe the defendant to be insane he was required to schedule a competency hearing without a jury. If, after such hearing the court determined that the defendant was not competent to stand trial, the defendant was remanded to the state department of mental health to be confined in an appropriate psychiatric institution until he should become sane. There was no provision for periodic review. Jackson contended that he was denied equal protection of the laws when the procedures applied to him were compared to either the Indiana provisions governing commitment of "feeble-minded" persons or Indiana's procedures governing commitment of mentally ill persons. Unlike *Baxstrom* and *Humphrey* the right to jury trial issue was not present in *Jackson*.

Mr. Justice Blackmun, for a unanimous Court[17] held in *Jackson* that the statute violated both equal protection and due process principles. As to the former, he wrote, after discussing *Baxstrom* (at 724, 92 S.Ct. at 1851):

If criminal conviction and imposition of sentence are insufficient to justify less procedural and substantive protection against indefinite commitment than that generally available to all others, the mere filing of criminal charges surely cannot suffice. * * *

Commenting upon the differences between the different Indiana procedures, Mr. Justice Blackmun further stated (at 727–30, 92 S.Ct. at 1852):

In contrast, however, what the State must show to commit a defendant under § 9–1706a, and the circumstances under which an individual so committed may be released, are substantially different from the standards under the other two statutes.

Under § 9–1706a, the State needed to show only Jackson's inability to stand trial. We are unable to say that, on the record before us, Indiana could have civilly committed him as mentally ill under § 22–1209 or committed him as feeble-minded under § 22–1907. The former requires at least (1) a showing of mental illness and (2) a showing that the individual is in need of "care, treatment, training or detention." § 22–1201(1). * * *

* * * * * *

More important, an individual committed as feeble-minded is eligible for release when his condition "justifies it," § 22–1814, and an individual civilly committed as mentally ill when the "superintendent or administrator shall discharge such person, *or* [when] cured of such illness." § 22–1223 (emphasis supplied). Thus, in either

case release is appropriate when the individual no longer requires the custodial care or treatment or detention that occasioned the commitment, or when the department of mental health believes release would be in his best interests. The evidence available concerning Jackson's past employment and home care strongly suggests that under these standards he might be eligible for release at almost any time, even if he did not improve. On the other hand, by the terms of his present § 9–1706a commitment, he will not be entitled to release at all, absent an unlikely substantial change for the better in his condition.

* * * * * *

As we noted above, we cannot conclude that pending criminal charges provide a greater justification for different treatment than conviction and sentence. Consequently, we hold that by subjecting Jackson to a more lenient commitment standard and to a more stringent standard of release than those generally applicable to all others not charged with offenses, and by thus condemning him in effect to permanent institutionalization without the showing required for commitment or the opportunity for release afforded by § 22–1209 or § 22–1907, Indiana deprived petitioner of *equal protection* of the laws under the Fourteenth Amendment. [Footnotes omitted; emphasis supplied.][18]

In United States ex rel. Schuster v. Herold, 410 F.2d 1071 (2d Cir.), cert. denied, 396 U.S. 847, 90 S.Ct. 81, 24 L. Ed.2d 96 (1969), cited in Humphrey v. Cady, 405 U.S. at 511 n. 7, 92 S.Ct. 1048, *supra*, Judge Irving R. Kaufman, faced with application of the same New York law involved in *Baxstrom*, explicitly extended *Baxstrom* to a situation in which the prisoner had been transferred to a

---

17. Mr. Justice Powell and Mr. Justice Rehnquist took no part in the consideration or decision.

18. In McNeil v. Director, 407 U.S. (at 249, 92 S.Ct. at 2086) *supra*, Mr. Justice Mar-

shall cited and relied upon *Jackson* in rejecting Maryland's assertion of "the power to confine petitioner indefinitely, without ever obtaining a judicial determination that such confinement is warranted."

mental institution during, rather than at the expiration of, his sentence, holding (at 1073):

For the reasons we shall set forth, we believe that before a prisoner may be transferred to a state institution for insane criminals, he must be afforded substantially the same procedural safeguards as are provided in civil commitment proceedings, including proper examination, a hearing upon notice, period-review of the need for commitment, and trial by jury. * * *

And (at 1081) Judge Kaufman wrote:

* * * *Baxstrom* clearly instructs that the *procedures* to be followed in determining whether one is committable must be unaffected by the irrelevant circumstance that one is or has recently been under sentence pursuant to a criminal conviction, although the fact that one has committed a crime may be relevant to the substantive conclusion that he is mentally ill. * * * [Emphasis in original.]

*See also* Waite v. Jacobs, 154 U.S.App. D.C. 281, 475 F.2d 392, 397 (1973); Cameron v. Mullen, 128 U.S.App.D.C. 235, 387 F.2d 193, 201 (1967); Romero v. Schauer, 386 F.Supp. 851 (D.Col. 1974) (three-judge Court).

The decision in *Murel* has seemingly resolved whatever doubt may have existed as to whether the principles established in *Baxstrom*, *Humphrey* and *Jackson* apply to a defective delinquency determination proceeding which takes place after conviction but at least six months before the expiration of sentence.[19] Accordingly, a comparison herein is required between the "criteria, procedures and treatment" available under Mary-

land's Defective Delinquency Act and those presently available to persons involuntarily committed in a civil proceeding in Maryland.

Plaintiffs advance a number of specifications in support of their claim of denial of equal protection, but two of them in particular are pressed. Plaintiffs claim that substantially different procedures and standards govern the release of defective delinquents from Patuxent and the release of involuntarily committed civil committees in Maryland. Plaintiffs also stress that a lower standard of burden of proof is required at a defective delinquency determination hearing than is required for an involuntary civil committal.

Maryland adopted a comprehensive mental health law effective July 1, 1970.[20] The Maryland Department of Health and Mental Hygiene enacted Regulation D— Regulations Governing Involuntary Admission to Facilities under the Jurisdiction of the Department of Mental Hygiene [21] effective December 5, 1970.[22]

A new and superseding regulation was adopted effective October 1, 1973. That new regulaton, Regulation 10.04.03, is currently in force.

The statutory provisions governing the release of involuntarily committed civil committees are set forth in 5B Md.Ann. Code art. 59, § 15 (1972 Repl. Vol.) which provides:

(a) *Petition to be filed; respondent.*—Any patient may, at any time, subject to the limitations specified in this section, file a petition in the equity court of the county in which he resides or resided at the time of his admission, or in which he is confined for the purpose of securing his re-

19. 3 Md.Ann.Code art. 31B, § 6(c) (1973 Cum.Supp.).

20. Mental Hygiene Law, ch. 407, Laws of Maryland 1970, 930.

21. The Department of Mental Hygiene is a part of the Department of Health and Mental Hygiene, 5B Md.Ann.Code art. 59, § 4 (1972 Repl.Vol.).

22. The Secretary of the Department of Health and Mental Hygiene has authority to make rules and regulations for the enforcement of the mental hygiene law. 5B Md. Ann.Code art. 59, § 6 (1972 Repl.Vol.).

lease. Any person having a legitimate interest in the welfare of the (patient may file the petition on his behalf. The Department shall be the respondent in any such case, unless the patient is a patient in a private facility or a Veterans' Administration hospital, in which case the private facility or the Veterans' Administration hospital shall be named as the respondent.

(b) *Form and contents of petition.* —The petition shall be in the form and contain data as may be designated by the Maryland Rules.

(c) *Trial by jury.*—The petitioner may request that his petition be heard by a jury, and thereafter, such trial shall proceed as in a civil action at law.

(d) *Issues to be determined; action by court upon jury decision.*—The issues to be determined are:

(1) Does the patient have any mental disorder; and

(2) Is the disorder of such a nature that for the protection of himself or others, the patient needs inpatient medical care or treatment.

If the jury or court sitting as a jury answers both questions affirmatively, the court shall remand the patient to the custody of the facility or Veterans' Administration hospital from which he petitioned for release. If either question is answered in the negative, the petitioner shall be released from the facility or Veterans' Administration hospital.

(e) *Appeals.*—Appeals may be taken from decisions on petitions as in any other equity cases and may be taken by the petitioner or the respondent.

(f) *Records of proceedings.*— Records of all such proceedings shall be made a permanent part of the patient record of each patient. ˙

(g) *Affidavit required for subsequent petition within one year.*— Once a patient has had a determination on the merits of any one petition filed by him pursuant to this section, no subsequent petition prepared by or for him shall be heard by a court of equity within one year of such prior determination, unless, in addition to all other required data, the petition is accompanied by a valid affidavit showing improvement of the patient's mental condition subsequent to the trial. No such affidavit shall be valid if executed by a patient of a facility or Veterans' Administration hospital. When filed, the petition and affidavit shall be reviewed by the court, and if the affidavit shows an improvement in the patient's mental condition, the petition shall be heard as provided in this section. If no substantial improvement in such condition is shown, the petition shall be dismissed.

A person confined at Patuxent can be released from Patuxent only if he is determined not to be a defective delinquent in either a delinquency determination [23] or redetermination hearing,[24] or if it is administratively determined that he should no longer be classified as a defective delinquent by Patuxent's own institutional review board which reviews and reexamines each person confined at Patuxent at least annually.[25] In connection with all of those procedures the test is whether the person at Patuxent comes within the definition of defective delinquent [26] and meets both components thereof, namely, (1) a propensity toward criminal activity and either intellectual deficiency or ˙ emotional unbalance and (2) a clearly demonstrable actual danger to society so as to require confinement and treatment. As to release from civil commitment, the components as set forth in the statute quoted in the preceding paragraph hereof are: (1) whether the

---

**23.** *See* 3 Md.Ann.Code art. 31B, § 8 (1971 Repl.Vol.).

**24.** *See* 3 Md.Ann.Code art. 31B, § 10 (1971 Repl.Vol.).

**25.** 3 Md.Ann.Code art. 31B, § 13 (1971 Repl. Vol.). ˙

**26.** *See* the statute quoted at n. 3 *supra.*

patient continues to suffer from a mental disorder, and (2) whether for the protection of himself or others, the patient requires inpatient medical care or treatment.

"Mental disorder" is defined in 5B Md.Ann.Code art. 59, § 3(f) (1974 Cum. Supp.):

> (f) "Mental disorder" means mental illness or any other form of behavioral or emotional illness resulting from any psychiatric or neurological disorder. The term shall not include mental retardation.

Until July 1, 1972, the words "or mental retardation" had followed the words "mental illness" and the last sentence had not been included.[27] As to the language of section 5 of the Defective Delinquency Act (see n. 3 supra), that language was considered at length by Judge Watkins in Sas, 295 F.Supp. at 395–99 and at 398 n. 10, supra). In that footnote, Judge Watkins wrote "[t]hat psychiatry is not an exact science, and that [its] terms * * * may in the opinion of psychiatrists be susceptible of improvement * * *." In Tippett, 436 F.2d at 1157 n. 15, supra, Chief Judge Haynsworth noted:

> In Schreiber, Indeterminate Therapeutic Incarceration of Dangerous Criminals: Perspectives and Problems, 56 Va.L.R. 602, it is suggested that the statutory definition of "defective delinquent" should be made more specific. Although we recognize the risk of vagueness inherent in the terminology employed, an attempt to make precise legal definitions of medical concepts embodies a risk of overdefinition. We do not think that the definition now used is so vague as to offend due process.

█ It may well be that the class of defective delinquents defined in article 31B, section 5 is substantially equivalent[28] to the classes of persons defined by Maryland law as "mentally disordered" or "mentally retarded" in article 59, section 3(f) and article 59A, section 3(j). Intellectual deficiency has been specifically equated by Judge Watkins with mental retardation. Sas v. State of Maryland, 295 F.Supp. at 398 n. 10, supra. With regard to each such class, Maryland law provides for a jury trial on the issues of defective delinquency, mental disorder and mental retardation. Furthermore, the jury determines in each case whether treatment or confinement is necessary for the protection of society.[29] In sum, the statutory provisions dealing with judicial release of defective delinquents, the mentally disordered and the mentally retarded are

27. Ch. 345, Laws of Maryland 1972, 958. In 1972 Maryland adopted a comprehensive Mental Retardation Law, 5B Md.Ann.Code art. 59A (1974 Cum.Supp.). Currently, provisions for judicial release of a mentally retarded person are found in that law, 5B Md. Ann.Code art. 59A, §§ 14(c), (d)(1) and (2) (1974 Cum.Supp.), which provides:

(c) The petitioner may request that his petition be heard by a jury, and thereafter, such trial shall proceed as in a civil action at law.

(d) The issues to be determined are:

(1) Is the person mentally retarded?

(2) Is the condition of such a nature that for the protection or adequate care of himself or others, the person needs in-residence care or treatment?

If the jury or court sitting as a jury answers both questions affirmatively, the court shall remand the person to the custody of the facility or Veterans' Adminis-

tration Hospital from which he petitioned for release. If either question is answered in the negative, the petitioner shall be released from the facility or Veterans' Administration Hospital.

Those provisions are substantially identical to the ones quoted supra from 5B Md.Ann. Code art. 59, §§ 15(c), (d)(1) and (2) which relate to judicial release of a mentally disordered person.

28. Except that the class of defective delinquents includes only those persons who evince "a propensity toward criminal activity" as well as an "intellectual deficiency or emotional unbalance, or both".

29. Seemingly, the "protection of himself" language in article 59, § 15(d)(2) and article 59A, § 14(d)(2) disadvantages civil committees in comparison with defective delinquents as to whom there is no comparable language in article 31B, § 5.

substantially similar.[30] Accordingly, plaintiffs' rights under the Equal Protection Clause would not appear to be violated insofar as those release provisions are concerned.

The Fourteenth Amendment "does not require absolute equality or precisely equal advantages", Ross v. Moffitt, 417 U.S. 600, 612, 94 S.Ct. 2437, 2444, 41 L.Ed.2d 341 (1974), quoting in part from San Antonio School District v. Rodriguez, 411 U.S. 1, 24, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973). It is in that context that the present differences in the release provisions pass constitutional muster. But it is also in that context that the standard of proof differences in defective delinquency hearings on the one hand and civil commitment hearings on the other hand must be examined.

Under Regulation 10.04.03 effective October 1, 1973 relating to Maryland's involuntary civil commitment process as to the mentally disordered, persons involuntarily admitted into a mental health facility under either article 59, section 12 or section 22 (dealing with involuntary or emergency admissions) are guaranteed a hearing within five days after commitment before an impartial hearing officer. Regulation 10.04.03 G provides in part:

> At such hearing, the hearing officer may admit and give probative effect to evidence which possesses probative value commonly accepted by reasonable and prudent men in the conduct of their affairs. He may exclude incompetent, irrelevant, immaterial and unduly repetitious evidence. Documentary evidence may be received in the form of copies or excerpts, or by incorporation by reference. The formal rules of evidence as practiced in the courts of law of this State shall not be applied.

> At such hearing, the person whose admission or retention as a patient is sought shall have the right to be represented by legal counsel of his choice; shall have the right to cross-examine adverse witnesses; shall have the right to present witnesses on his own behalf and shall have the right to present other evidence which may be relevant. The patient shall have the right to appear dressed in his own clothing at the hearing if he so desires. The hearing officer shall, upon request and good cause shown, issue appropriate process to compel the attendance of witnesses and the production of documents and/or other tangible evidence. The records of the institution dealing in any respect with the person whose admission or retention as a patient is sought shall, upon request, be made available to counsel for such person in order to enable counsel to prepare for the hearing referred to in this subsection.

> A mechanical recording of the hearing shall be made, but no transcription shall be made unless and until an appropriate appeal is taken. At such hearing, in order to justify admission or retention of the patient, it must be affirmatively shown *by clear and convincing evidence* [31] that each of the following elements exists:

> (1) That the person whose admission or retention is sought is suffering from a mental disorder, *and*

---

30. In these cases the plaintiffs have not pressed the issue of any difference between the apparent right of a civil committee to petition for release annually and the apparent entitlement of a defective delinquent to a redetermination hearing only once every three years. Accordingly, this Court has not considered that question herein. *See* n. 33 *infra.*

31. Before Regulation 10.04.03 became effective on October 1, 1973, there was no provision in Maryland law for any administration hearing. An involuntarily committed civil committee could petition for judicial release pursuant to 5B Md.Ann.Code art. 59, § 15. The standard of proof in such an action was the "preponderance of the evidence" standard. *See* Bush v. Director, 22 Md.App. at 363, 324 A.2d 162, *supra.* Accordingly, prior to October 1, 1973, the same standard of proof was employed in connection with defective delinquency determinations and civil commitments. *See Tippett*, 436 F.2d at 1159, *supra* quoted at p. 1079 *supra.*

(2) that the person whose admission or retention is sought is in need of institutional in-patient care, *or treatment*, and

(3) that the person whose admission or retention is sought presents a danger to his own life or safety or the life or safety of others.

If, upon all of the evidence, the hearing officer shall find from all of the admissible evidence presented to him that any one or more of the aforegoing has not been proved, he shall so certify, and the person whose admission or retention is sought shall forthwith be released from the facility. If the hearing officer shall find from all the evidence presented to him that all of the foregoing elements have been proved, he shall so certify and the person whose admission or retention is sought shall thereupon be admitted as a patient to a qualified facility, or retained as a patient therein, as the case may be. In the event that the Hearing Officer shall certify the admission or retention of a patient in a facility, he shall at the conclusion of the hearing, advise the patient of his right to seek judicial release from such facility pursuant to the provisions of Maryland Code Article 59, Sections 14 and 15. [Emphasis supplied.]

In Bush v. Director, 22 Md.App. 353, 324 A.2d 162 (1974), cert. denied, —— Md. —— (Oct. 24, 1974), a broad attack was made on the Defective Delinquency Act on equal protection grounds.[32] Writing for the Court of Special Appeals, Judge Gilbert included (at 362–64, 324 A.2d at 168–69) the following comparison between defective delinquency proceedings pursuant to article 31B and involuntary civil commitment pursuant to article 59 and Regulation 10.04.03:

### Table of Comparison

| Article 31B | Mental Health Regulation 10.04.03 Pursuant to Article 59. |
| --- | --- |
| Court trial with choice of jury or non-jury. | Administrative hearing. |
| Right of discovery. | Not provided. |
| Entitled to examination by psychiatrist of own choosing at State expense. | Not provided. |
| Criminal convictions, court referral for examination and evaluation; by psychiatrist, medical doctor and psychologist; conclusion of majority of experts as to defective delinquency. | Certification of two medical doctors. |

A perusal of the above comparison table makes it crystal clear that an alleged defective delinquent is not denied equal protection of the law.

A person who is referred to a mental health facility has not been convicted of a crime. He is, at most, alleged to be suffering from some mental disorder. Md.Ann.Code art. 59, § 12(a)(1). In order to assure that individuals committed involuntarily to mental health facilities are actually suffering from a mental disorder, the Secretary has adopted such rules as he thinks will preclude the possibility of a person who does not suffer from

---

**32.** This Court, with the consent of all counsel, held the within case *sub curia* until the final termination of the *Bush* case, in the interests of comity and so as to obtain a definitive statement of Maryland law relating to certain of the issues posed herein.

mental disorder from being detained in a mental health facility.

We observe that Md.Ann.Code art. 59, § 15 sets forth the procedure for an appeal to the courts from the decision of the Department of Health and Mental Hygiene. Section 15 provides in pertinent part:

"(a) *Petition to be filed; respondent.*—Any patient may, at any time, . . . file a petition in the equity court of the county in which he resides or resided at the time of his admission, or in which he is confined for the purpose of securing his release. . . . The Department shall be the respondent in any such case, unless the patient is a patient in a private facility or Veterans' Administration hospital, in which case the private facility or Veterans' Administration hospital shall be named as the respondent.

\* \* \* \* \* \*

(c) *Trial by jury.*—The petitioner may request that his petition be heard by a jury, and thereafter, *such trial shall proceed as in a civil action at law.*

\* \* \* \* \* \*

(e) *Appeals.*—*Appeals may be taken from decisions or petitions as in any other equity cases* and may be taken by the petitioner or the respondent." (Emphasis supplied).

We think it unmistakable that the Legislature meant that in any judicial proceeding arising out of Md.Ann. Code art. 59, § 15 that the courts employ the civil case rules in conducting such a hearing, be it jury or non-jury. Ordinarily, a case heard in any equity court or civil action at law requires only the preponderance of evidence standard. Had the Legislature intended a greater degree of proof, it would have said so. It is apparent, therefore, that even though the Secretary requires his departmental hearing officers to ascertain by "clear and convincing evidence" that an individual is: (1) suffering from a mental dis-

order, (2) in need of in-patient care or treatment, and (3) a danger to himself or others, that, when a patient files a petition in court, the standard then employed is not "clear and convincing evidence", but rather a "preponderance of the evidence". While it is somewhat of an anomaly to have a higher standard of proof required in an administrative hearing than that used by the Courts on appeal in the same case, nevertheless, by virtue of the Secretary's adoption of the "clear and convincing standard", that is exactly the situation that has developed.

The Secretary's election to utilize the standard of "clear and convincing evidence" in his Department's administrative hearings does not affect the standard used by the Courts in other proceedings, nor may the Secretary's administrative rules, in the absence of a clear legislative intent to the contrary, supersede the decisions of the Court of Appeals or this Court.

We cannot conceive of a court's holding that an administrative regulation, requiring a standard of proof different from that required by the courts in similar cases, is tantamount to a denial by the State of equal protection of law where the court standard complies with constitutional minimum standards. If such were the case, then, hypothetically, a State agency, authorized to adopt rules and regulations, could determine that in all hearings before it the standard of proof required to establish guilt would be more than "beyond a reasonable doubt", i. e., proof of "guilt to a mathematical certainty". It would follow that the State in all criminal cases would be required to scrap the present standard of proof beyond a reasonable doubt and to substitute therefor proof of guilt to a mathematical certainty. Otherwise, the State would subject itself to attack on the theory of denial of equal protection.

■ This Court respectfully disagrees. Herein, it is not necessary to determine

**1090**

all of the issues present in the hypothetical case posed by Judge Gilbert. Herein, this Court simply notes that it is initially up to the legislature of the State of Maryland to determine the extent to which it, the legislature, delegates rule-making power to any administrative agency. The question before this Court is the one the Supreme Court seemingly reserved (407 U.S. at 357–58, 92 S.Ct. at 2093) in *Murel, i. e.*, the extent to which Maryland may under equal protection principles provide different "criteria, procedures, and treatment" for Patuxent inmates on the one hand and to "other persons, not 'defective delinquents,' committed for compulsory psychiatric treatment", on the other hand, regardless of whether Maryland so does by statute, administrative regulation, or a combination thereof.

The first key determination governing initial involuntary civil commitment of a "mentally disordered" person is at the administrative stage, and unless a person is administratively found to be a person who should be so committed, under the "clear and convincing" standard, there is no further involuntary civil commitment of such person. Therefore as to him, the fact that the standard of proof which would be applicable to him in a judicial release hearing, if he were placed or continued in confinement, would be the preponderance of the evidence standard, is of little or no initial import. By way of contrast, at the present time, for a person to be confined and continued in confinement at Patuxent, possibly for the rest of his life, a jury or if the defendant prefers, a judge sitting without a jury, need only find by a preponderance of the evidence that that defendant is a defective delinquent.

■ *Murel* suggests strongly that the difference with regard to standard of proof, existing in Maryland since October 1, 1973, as between defective delinquents on the one hand and civil committees on the other hand, may not prevail unless there is a strong reason therefor. The only reason the State has offered in support of its use of different standards of proof for defective delinquency determinations and involuntary civil commitments is that persons in the former category of proceedings have been convicted of one or more crimes while those in the latter category have not. But that contention has been specifically rejected by the Supreme Court.[33] In *Tippett*, while not going to the extent Judge Sobeloff did in his dissent, Chief Judge Haynsworth expressed, in a setting not dominated by *Murel* and by Maryland's October 1, 1973 change as to civil committees, the discomfort of the majority of the Court in *Tippett* with a burden of proof less than the "clear and convincing evidence" standard. As noted *supra*, Chief Judge Haynsworth also cautioned (in n. 18) as to the need to keep a "weather eye" open in connection with the future administration of Maryland's Defective Delinquency Act. In In re Winship, 397 U.S. 358, 370, 90 S.Ct. 1068, 1076, 25 L.Ed.2d 368 (1970), Mr. Justice Harlan, in his concurring opinion, wrote that—

> * * * a standard of proof represents an attempt to instruct the factfinder concerning the degree of confidence our society thinks he should have in the correctness of factual conclusions for a particular type of adjudication. * * *

In this case, equal protection principles require that there be utilized in a hearing involving determination or redetermination of defective delinquency a standard no less than the standard Maryland utilizes with regard to civil commitment.

■ The plaintiff Carl was determined to be a defective delinquent after October 1, 1973. *See* n. 2 *supra*. In this Court's opinion he has been denied the equal protection of the law. The other three plaintiffs in these cases have not been so denied that protection since,

---

33. *See* the discussion *supra* of *Baxstrom* and *Jackson*.

on the respective dates they were each determined to be defective delinquents, the same standard of proof, that is, the preponderance of the evidence test, applied to determinations regarding both defective delinquency and involuntary civil commitment.[34]

## IV. CONCLUSION

 Carl's seven-year sentence, pronounced in 1972,[35] still has some period to run. Carl is therefore not entitled to his release from custody but he is entitled to a transfer from Patuxent un-

less he is afforded a new defective delinquency hearing [36] in which the clear and convincing evidence standard rather than the preponderance of the evidence standard is used. As a matter of right, pursuant to 3 Md.Ann.Code art. 31B, § 10(a),[37] Carl would appear to be entitled to his initial redetermination hearing in September, 1976.[38] But Carl, because he was denied the equal protection of the laws on November 2, 1973, is at this time entitled promptly either (a) to a transfer from Patuxent, or (b) to a new defective delinquency hearing in which the clear and convincing evidence

34. *See* n. 31 *supra.*

35. *See* n. 1 *supra.*

36. *See* n. 2 *supra* as to Carl's first defective delinquency hearing. *Cf.* Feldman v. Boslow, Civil No. 72–946–H (D.Md. June 26, 1973) (a copy of that opinion has been placed in the official court file in *Dower*), as to Carl's entitlement to a new defective delinquency hearing as the result of this Court's conclusions stated herein.

37. That section provides, in part:
 *Who may file; hearing and determination.* —After any person shall have been committed under § 9(b) as a defective delinquent, shall have been confined for two years after such commitment, and shall have been confined for a total period, including any period of confinement under his original sentence prior to commitment under § 9(b), equal to two thirds of his original sentence, such person or anyone in his behalf, including the director or any officer or employee of Patuxent Institution, may file a petition requesting that such person be brought before the court in which such petition is filed for the purpose of having the defective delinquency of such person redetermined. * * *

38. This Court notes that pursuant to 3 Md. Ann.Code art. 31B, § 10(b), a person confined at Patuxent is entitled to redetermination hearings subsequent to his first redetermination hearing as to the defective delinquency, only at three-year intervals whereas pursuant to 5B Md.Ann.Code art. 59, § 15(g) a mentally disordered person may petition for the termination of his commitment annually, as a matter of right, and more often if a valid affidavit as to his improved condition is submitted. In Carter v. Watts and Boslow, Civil No. W–74–1136 (D.Md. filed Oct. 15, 1974), a case currently pending before a three-judge Court convened in this District,

pursuant to 28 U.S.C. § 2281, plaintiff seeks injunctive and declaratory relief declaring 3 Md.Ann.Code art. 31B, §§ 10(b), (c) unconstitutional in view of those statutory differences. In *Carter,* as noted *supra,* injunctive relief is sought. In the within cases only federal habeas corpus relief is sought. " * * * [A] district court may determine the merits of a habeas claim without the necessity of impaneling a three-judge court." Dorrough v. Estelle, 497 F.2d 1007, 1009 n. 3 (5th Cir. 1974) (Wisdom, J.), and cases cited therein.

The possibility that the State may be unduly burdened in terms of more hearings and in terms of its total workload, by holding redetermination hearings as to defective delinquency more often than once every three years, is seemingly raised in the *Carter* case. Herein, the issue deemed crucial by this Court relates to the fairness, *vel non,* under due process and equal protection standards of the utilization in four defective delinquency determination proceedings of the "preponderance of the evidence" burden of proof standard. The State is not required to hold more or less hearings by the requirement that the burden of proof test be "clear and convincing evidence" rather than "preponderance of the evidence". The State's burden of proof is increased but not its workload. That could not of course be said if the holding as to the plaintiff Carl in the within opinion is applied to all persons determined or redetermined to be defective delinquents on or after October 1, 1973. *Cf.* Woodall v. Pettibone, 465 F.2d 49 (4th Cir. 1972). But the issue of retroactive application, *vel non,* back to October 1, 1973, of the principles pursuant to which relief is granted herein to the plaintiff Carl is not before this Court at this time, will not be further commented upon herein, and poses a separate and distinct question not present herein.

standard is used. Such a hearing should be held, or Carl should be so transferred, within sixty days after this Court's within judgment as to Carl becomes final. As to Dower, Brooks and Hawkins, their respective quests for relief in these cases are hereby denied.