James Gordon CORNELL #2426

v.

STATE OF MARYLAND.

James Gordon CORNELL #2426

v.

DIRECTOR, PATUXENT INSTITUTION.

James Gordon CORNELL

v.

Harold M. BOSLOW, M. D., etc., et al.

Civ. Nos. 72-1220-K, 73-215-K, 73-495-K.

United States District Court,
D. Maryland.

May 8, 1975.

John F. Fader, II, Towson, Md., for plaintiff.

Francis B. Burch, Atty. Gen. of Md., John P. Stafford, Jr., and Donald R. Stutman, Asst. Attys. Gen., for defendants.

FRANK A. KAUFMAN, District Judge.

Cornell, presently confined in the Patuxent Institution, seeks in these cases habeas corpus relief, monetary damages and "a transfer out of Patuxent" to a more conventional confinement institution of the Maryland Division of Correction.[1] Cornell was convicted of bur-

---

[1] A previous quest for habeas corpus relief by Cornell based on alleged sexual discrimination in that no female has been determined a defective delinquent was denied by this Court.

Cornell, et al. v. Boslow, Civil No. N–74–491 (D.Md. July 3, 1974), appeal dismissed, No. 74–2035 (4th Cir. April 15, 1975).

glary on April 27, 1970 after a non-jury trial before Judge John E. Raine, Jr., sitting in the Circuit Court for Baltimore County, in which trial Cornell was represented by privately retained counsel. On that day, Judge Raine sentenced Cornell to a term of confinement of eighteen years. Subsequently, after conferring in chambers with Cornell's trial counsel, Judge Raine reduced Cornell's sentence from eighteen to eight years,[2] and referred him to the Patuxent Institution for examination as a possible defective delinquent. In that connection, it is to be noted that after Judge Raine found Cornell guilty on April 27, 1970, Cornell addressed the Court as follows (T. Tr. 61):

> Well, your Honor, I'd like to go to Patuxent.

Cornell's conviction was affirmed on appeal by the Court of Special Appeals of Maryland in an unreported opinion authored by Judge Charles E. Moylan, Jr. on February 9, 1971. No further direct appellate review was sought by Cornell. On November 29, 1971, Judge Walter M. Jenifer, sitting in the Circuit Court of Baltimore County, denied Cornell's quest for post-conviction relief after having appointed counsel other than Cornell's trial attorney to represent Cornell and after conducting a two-day evidentiary hearing on April 26 and 27, 1971. Leave to appeal from that denial was itself denied on January 24, 1972 by the Court of Special Appeals of Maryland.

Cornell arrived at Patuxent on June 16, 1970, but now alleges that upon the advice of counsel, he refused to submit at Patuxent to a diagnostic examination for approximately twenty months. On February 1, 1972, Cornell did submit to such an examination by members of the Patuxent Diagnostic Staff. On February 22, 1972 that institution filed a Diagnostic Staff Report with the Circuit Court for Baltimore County in which report the opinion was expressed that Cornell met the definition of a defective delinquent as set forth in 3 Md.Ann.Code art. 31B, § 5 (1971 Repl. Vol.), and that therefore Cornell should be committed to Patuxent. On November 22, 1972, after a jury trial in the Circuit Court for Baltimore County, Judge John G. Turnbull presiding, Cornell was determined to be a defective delinquent. A motion for a new trial was subsequently denied by Judge Turnbull. Cornell's application for leave to appeal from the determination of defective delinquency was denied in a six-page unreported Opinion filed by the Court of Special Appeals of Maryland on February 27, 1973.

On February 15, 1972, Cornell filed a petition for habeas corpus relief in the Circuit Court for Montgomery County which, on April 26, 1972, was transferred by that Court to the Circuit Court for Baltimore County. On June 30, 1972, Judge Walter R. Haile sitting in that Court denied relief in a written Memorandum and Order.[3]

On February 17, 1972, Cornell apparently filed a habeas corpus petition in

2. *See* the letter from Judge Raine to Cornell dated July 8, 1970 in the official court file in Civil No. 72–1220–K.

3. In a communication received by this Court during the preparation of this opinion, Cornell's counsel in these cases appears to raise, seemingly at the specific request of Cornell, for the first time, an issue regarding certain interrogatories which were allegedly submitted to certain employees at Patuxent during the course of Cornell's habeas corpus proceeding before Judge Haile but which were signed by a Patuxent official, Mr. Forrest Calhoun, who was not a party to that litigation, nor is a party to any of the cases herein. Cornell

has not expressly alleged that in that connection any rule of Maryland procedure has been violated. Nor would it appear that such did occur. But even assuming *arguendo* that a violation did so occur, it occurred in a state habeas corpus proceeding, and federal habeas corpus is not available to challenge error which occurred in such a collateral proceeding. *See* Stokley v. State of Maryland, 301 F.Supp. 653, 657 (D.Md.1969); Jackson v. Warden, Civil No. 19822 (D.Md. Aug. 22, 1968), aff'd No. 12,858 (4th Cir. Nov. 26, 1968). *See also* Noble v. Sigler, 351 F.2d 673, 678 (8th Cir. 1965), cert. denied, 385 U.S. 853, 87 S.Ct. 98, 17 L.Ed.2d 81 (1966).

the Circuit Court for Baltimore County. On March 6, 1972, however, Cornell wrote to Chief Judge Lester L. Barrett of that Court asking that his said petition be withdrawn. Judge Barrett granted that request on the same day.

On March 7, 1972, Cornell filed a habeas corpus petition in the Baltimore City Court. Judge Joseph C. Howard sitting in that Court denied relief on September 22, 1972. Cornell's appeal from that decision was dismissed on November 3, 1972 by the Court of Special Appeals of Maryland.

### Civil No. 72–1220–K

■ In Civil No. 72–1220–K, in which he seeks federal habeas corpus relief, Cornell has raised a number of contentions, but as his counsel has stated in a letter to this Court dated November 2, 1973, p. 5, "[t]he gist of the argument in this case is the alleged ineffective representation given by" Cornell's trial counsel. Cornell, in this proceeding, both through his own *pro se* presentations and the presentations of his counsel appointed by this Court (the same counsel who represented him in his post-conviction proceeding before Judge Jenifer), has elaborated considerably upon the contentions he advanced before Judge Jenifer, as illustrated by the following dialogue between Cornell and his present counsel (PCPA Tr. 11–12):[4]

> Q (By Mr. Fader) There are facets to your allegations of incompetency, but that is the sole ground, is that correct?
>
> A Yes.
>
> Q Different ways we allege that he was incompetent?
>
> A Yes, sir.
>
> Q Now, during my visits with you at Patuxent we have examined the whole case of the possible grounds for a post conviction relief, did we not?

> A Yes, sir.
>
> Q As a matter of fact I read off a checkoff list of some of the grounds that have been raised, did I not?
>
> A Yes, sir.
>
> Q Such as illegal arrest, illegal search and seizure, various other matters?
>
> A Yes, sir.
>
> Q Did I not?
>
> A Yes, sir.
>
> Q And you are satisfied that right now this is the only ground that we really have anything to proceed on?
>
> A Yes, sir.
>
> Q And there are no other grounds to be brought before the Court's attention today?
>
> A Yes, sir.

In view of Cornell's having had his opportunity to raise before Judge Jenifer all of the detailed allegations he asserts herein, and his failure so to do, it might well be that in any future proceeding in a Maryland court, Cornell might find himself fully or partially blocked by 3 Md.Ann.Code art. 27, § 645A(c) (1971 Repl. Vol.) and Maryland Rule BK 48 (a) and the application of the doctrine that he is deemed to have waived his rights because of his failure to elaborate upon his allegations before Judge Jenifer, unless he is able to show "special circumstances" which excuse "his failure to make such allegation[s]" in his first post-conviction proceeding. *See* Faulkner v. Director, 241 Md. 727, 217 A.2d 342 (1966); Sewell v. Warden, 235 Md. 615, 200 A.2d 648 (1964). However, since such elaborations in Civil No. 72–1220–K are peripheral to Cornell's claim of inadequacy of trial counsel and since exhaustion in a habeas corpus case "is not a jurisdictional concept but simply a flexible matter of comity", Jenkins v. Fitzberger, 440 F.2d 1188, 1189 (4th Cir.

---

4. Herein "PCPA Tr." is used to refer to the transcript of Cornell's post-conviction hearing before Judge Jenifer; "T.Tr." to the transcript of Cornell's trial; "Tr." to the transcript of the proceedings in this Court; and "D.D.Tr." to the transcript of the proceedings of Cornell's defective delinquency hearing.

1971), *quoting from* Williams v. Coiner, 392 F.2d 210, 213 n. 2 (4th Cir. 1968), this Court will consider and determine on the merits all of the allegations stated by Cornell in Civil No. 72–1220–K without requiring Cornell further to attempt to raise, pursue and exhaust those issues in another Maryland post-conviction proceeding.

Cornell was convicted, at least in large part, by the testimony of the owner of the home Cornell was accused of burglarizing, who testified that as he returned home he came upon a sole burglar and grappled with him. The victim identified Cornell as the burglar and so testified at Cornell's trial. The police, called by the victim, discovered, near the latter's house and apparently on the latter's property, a flashlight upon a battery of which Cornell's fingerprints were found.

Among Cornell's contentions is that false testimony was given at his trial by two police officers, one of whom was the investigating officer whose testimony was relevant in the light of the testimony of the victim, Adams, whose house was the one Cornell allegedly robbed. Adams testified that he (Adams) had not noticed that Cornell had had a flashlight while they were both in the house (T. Tr. 20). Officer Berg, the investigating officer first on the scene, testified at trial, while reading from a copy of the investigating report he had made at the time of his initial investigation, that Adams had then informed him that Adams observed a subject "with a flashlight" in Adams' house (T. Tr. 25). Cornell stresses that inconsistency. However, Adams did testify that Cornell had a flashlight when he and the burglar grappled outside of Adams' house, that the burglar dropped that flashlight and that it was recovered by the police. (T. Tr. 20, 22, 26–27). So there is little if any importance to the allegation of alleged improper testimony by the investigating officer.

■ Cornell further points out that he was taken into custody on the evening of February 12, 1970 and at that time

the fingerprint comparison card which was entered into evidence at trial was made. Sergeant Krause, the second officer whose testimony Cornell attacks and who actually made the comparison between the fingerprint found on the flashlight battery and the fingerprint comparison card, testified at trial that he made that comparison at 10:10 *a. m.* on February 12, 1970 (T. Tr. 45). Since there was testimony that the normal procedure followed was that after the person was "mugged", his print card was placed on Sergeant Krause's desk for comparison (T. Tr. 35), and since apparently the print card bears indications that it was taken at 10 *p. m.* on February 12, 1970, it would appear that Sergeant Krause either misspoke and meant 10:10 p. m., not a. m., or that normal procedure was not followed. Cornell has apparently not specifically raised herein the allegation that there was anything improper in fingerprinting him after arrest. Such a contention would, of course, be meritless. Once Cornell was lawfully in custody, a fingerprint card taken of him could lawfully be introduced as evidence. United States v. Aloisio, 440 F.2d 705, 710–11 (7th Cir.), cert. denied sub nom. Bartoli v. United States, 404 U.S. 824, 92 S.Ct. 69, 30 L.Ed. 2d 51 (1971). Compare Davis v. Mississippi, 394 U.S. 721, 727–28, 89 S.Ct. 1394, 22 L.Ed.2d 676 (1969); Bynum v. United States, 104 U.S.App.D.C. 368, 262 F.2d 465, 467–69 (1958). Thus, Judge Raine's overruling (T. Tr. 35) of Cornell's trial counsel's objection to the admissibility of the fingerprint comparison card clearly poses no constitutional or, seemingly, any other problem.

■ "[T]he knowing use of false evidence" by the prosecution in a criminal proceeding does constitute constitutional error. Miller v. Pate, 386 U.S. 1, 7, 87 S.Ct. 785, 788, 17 L.Ed.2d 690 (1967). However, Cornell's complaints as to the testimony of the two police officers in no way indicate that the State purposely used false evidence or that in connection with the alleged discrepancies to which

Cornell points, there was any "fundamental unfairness" or even an approach to "a deprivation of constitutional rights". Grundler v. North Carolina, 283 F.2d 798, 802 (4th Cir. 1960) (Soboleff, C. J.).

Cornell advances in Civil No. 72–1220–K one other contention which does not relate to the adequacy of his trial counsel. That contention deals with the conduct and results of Cornell's state postconviction proceeding before Judge Jenifer. But that contention is of no import herein since federal habeas corpus relief is not available to challenge a collateral proceeding such as one under 3 Md.Ann. Code art. 27, § 645A. Stokley v. State of Maryland, 301 F.Supp. 653, 657 (D. Md.1969); Jackson v. Warden, Civil No. 19822 (D.Md. Aug. 22, 1968), aff'd, No. 12,858 (4th Cir. Nov. 26, 1968). See Noble v. Sigler, 351 F.2d 673, 678 (8th Cir. 1965), cert. denied, 385 U.S. 853, 87 S.Ct. 98, 17 L.Ed.2d 81 (1966).

Cornell's principal contention in Civil No. 72–1220–K, as indicated supra, is that he was denied the effective assistance of counsel in his original trial. That contention was the major one raised in Cornell's two-day, evidentiary post-conviction proceeding. Cornell's trial counsel was privately retained and was not court-appointed. The issue of whether a different or lower standard applies in a federal habeas corpus attack upon the trial performance of privately retained counsel as opposed to the performance of court-appointed counsel has divided many eminent jurists. See, e. g., on the one hand, Judge Friendly dissenting in United States ex rel. Smith v. McMann, 417 F.2d 648, 657 (2d Cir. 1969) (en banc); Judge O'Sullivan dissenting in Goodwin v. Cardwell, 432 F.2d 521, 523 (6th Cir. 1970); Root v. Cunningham, 344 F.2d 1, 3 (4th Cir.) cert. denied, 382 U.S. 866, 86 S.Ct. 135, 15 L.Ed.2d 104 (1965); Morton v. Welch, 162 F.2d 840, 842 (4th Cir.), cert. denied, 332 U.S. 779, 68 S.Ct. 44, 92 L.Ed. 363 (1947); Johnson v. Smith, 295 F.Supp. 835, 838 (N.D.Ga.1968), aff'd, 414 F.2d 645 (5th Cir. 1969); and on the other hand, United States v. Marshall, 488 F.2d 1169, 1192–93 (9th Cir. 1973) (Duniway, J.); West v. Louisiana, 478 F.2d 1026, 1032–34 (5th Cir. 1973) (Wisdom, J.); Goodwin v. Cardwell, supra at 522 (Phillips, C. J.); United States ex rel. Smith v. McMann, supra at 655 (Medina, J.); Johnson v. Smith, 414 F.2d supra at 647; United States v. Reincke, 383 F.2d 129, 133–34 (2d Cir. 1967). In this case in which trial counsel was provided by Cornell's parents, this Court will assume, arguendo, that the same principles apply whether privately retained or court-appointed counsel was involved.

Cornell attacks the competency of his trial counsel on four specific grounds. First, he contends that his trial counsel did not call witnesses who were available and who would have provided Cornell with an alibi for the night of the Adams robbery, December 15, 1969. Second, Cornell alleges that his trial counsel did not call witnesses who were available and who would have provided testimony that the flashlight which was left outside the Adams house and which had Cornell's fingerprint on a battery had been stolen from Cornell three days previously. Third, Cornell argues that his trial counsel did not challenge the admissibility of Cornell's fingerprint identification card when it was offered into evidence. Finally, Cornelly complains that his trial counsel did not attack an alleged inconsistency between Adams' identification of Cornell at trial and Adams' description of the robber to police at the time of the robbery.

Incompetency of counsel was a major issue during both Cornell's PCPA hearing before Judge Jenifer and during the two lengthy evidentiary hearings held by this Court in these cases. Cornell was competently represented by counsel different from his trial counsel at all of those hearings, gave lengthy testimony himself and presented the testimony of a considerable number of witnesses on his behalf. That testimony throws squarely into issue the question of the credibility of the plaintiff vis-a-vis his

former trial counsel. Judge Jenifer does not appear to have made any specific finding regarding the relative credibility of Cornell and of his trial counsel. However, Judge Jenifer's denial of relief and the general tenor of his opinion seemingly indicate that at the very least Judge Jenifer did accept the credibility of the testimony of Cornell's trial counsel. For example, at p. 5 of his PCPA Opinion, Judge Jenifer wrote:

> * * * Mr. Cornell now contends that he told his son's counsel that he had seen a flashlight in the glove compartment on Tuesday prior to the time the car was broken into, but this Court accepts the trial counsel's statement that he had no knowledge of this information.

In any event, this Court, after carefully considering the testimony before it, finds the testimony of Cornell's trial counsel completely credible and accepts it as true. To the extent that testimony offered by Cornell or by any witness called by him is inconsistent with the testimony of Cornell's trial counsel, such other testimony is rejected by this Court. Specifically, this Court accepts trial counsel's testimony that he was unaware that Cornell was dissatisfied with his representation until after the trial. Although Cornell has provided evidence that he was visited at the Baltimore County Jail by another attorney while Cornell was awaiting trial, there is no proof that Cornell's trial counsel was ever informed before trial of that fact. Cornell alleges that he sent a telegram before trial from the jail discharging his trial counsel, who had been retained by Cornell's parents, not by Cornell himself. However, Cornell has presented no evidence that such a telegram was ever sent, and this Court accepts trial counsel's statement that he never received " * * * in any way, shape, manner or form directly or in-

directly * * * " (Tr. 180) any indication that Cornell did not want trial counsel to represent him. Nor does the trial transcript in any way indicate any conflict between Cornell and his trial counsel.

Further, and of considerably more import, this Court accepts trial counsel's statement (Tr. 121) that Cornell admitted his guilt to trial counsel before trial. Such an admission seemingly would necessarily affect trial counsel's preparation and presentation of Cornell's case at trial. Canon 7 of the Code of Professional Responsibility of the American Bar Association which has been adopted by the Court of Appeals of Maryland, Md.R.P. 1230, provides:

> A Lawyer Should Represent a Client Zealously Within the Bounds of the Law.

Ethical Consideration EC 7–26 of the Code provides:

> The law and Disciplinary Rules prohibit the use of fraudulent, false, or perjured testimony or evidence. A lawyer who knowingly participates in introduction of such testimony or evidence is subject to discipline. A lawyer should, however, present any admissible evidence his client desires to have presented unless he knows, or from facts within his knowledge should know, that such testimony or evidence is false, fraudulent, or perjured.

And Disciplinary Rule DR 7–102 of the Code provides in part:

> Representing a Client Within the Bounds of the Law.
>
> (A) In his representation of a client, a lawyer shall not:
>
> * * * * * *
>
> (4) Knowingly use perjured testimony or false evidence.[5]

---

5. The obligations which trial counsel has to his client and to the Court and the "trilemma"—*i. e.*, "to know everything, to keep it in confidence, and to reveal it to the court", is discussed in depth in M. Freedman, "Perjury: The Lawyer's Trilemma", LITI- GATION, THE JOURNAL OF THE SECTION OF LITIGATION, AMERICAN BAR ASSOCIATION 26 (1975). In that article, Dean Freedman, in the course of pointing to certain inconsistencies in the canons and while indicating that a defense lawyer in a

Testifying before Judge Jenifer, Cornell's trial counsel stated (PCPA Tr. 160):

> Well, that is one of the reason [sic] I did not put some of these people on the stand, because I was honored with certain privileged information. If I put them on the stand they might have been subjected to a charge of perjury.

And in this Court, trial counsel testified (Tr. 116):

> I did not want to put them in that position, I did not want to put myself in the position of calling someone who would testify under oath to a falsehood, and I didn't want to put the Defendant Mr. Cornell in that position of having that type of testimony come in that might be subject to perjury charges.

If Cornell had committed the crime, any witness who would have testified as to a complete alibi could not possibly have been telling the truth. And, since Cornell specifically told his trial counsel that he had dropped the flashlight at the scene of the crime,[6] any testimony about the theft of *a* flashlight from Cornell three days before the crime would have been misleading at the very least. Therefore, even if it be assumed that trial counsel was informed by Cornell prior to trial that there were witnesses available who would offer an alibi for Cornell and who would testify that the flashlight had been stolen prior to the crime, it may well have been improper for trial counsel to offer such testimony to the Court. Certainly, trial counsel's actions in not offering such evidence can hardly be classified as incompetence or inadequacy. Further, however, in point of fact, it was far from clear before trial to Cornell's trial counsel just what alibi testimony was available. Originally, trial counsel was told by Cornell that a Mrs. Jones could provide Cornell with an alibi (Tr. 118). However, after initially indicating a willingness to provide Cornell with an alibi, that lady, at a subsequent interview with trial counsel which took place after Cornell had confessed his guilt to his trial counsel, "became", according to trial counsel, "very reluctant" and said that she would rather not testify (Tr. 127).

Additionally, Cornell presently claims that a different woman, Mrs. Pauline DiGristine, could have provided him with an alibi for the night of the crime. Cornell's trial counsel testified during the proceedings in this Court that, as far as he knew at and before the time of the trial, Mrs. DiGristine's testimony would only have dealt with a search the police made of the trunk of Cornell's car at which time they apparently seized evidence as to other crimes for which Cornell was charged but in connection with which prosecution was not continued after Cornell's conviction for the Adams robbery. (Tr. 150–51).

At Cornell's PCPA hearing, Mrs. DiGristine (her name is apparently misspelled as Digirstina in the PCPA transcript) testified on direct examination that she had spent the evening of December 15 from 6 p. m to 11 p. m. with Cornell and that she would have testified to that effect if she had been called to testify at trial and, further, that although she was in the courtroom during Cornell's trial she was not called to testify. (PCPA Tr. 67–71). On cross-examination, however, that lady stated that when she was interviewed by Cornell's trial counsel the day before Cornell's trial at trial counsel's office, she had said nothing about being with Cornell on the night of the crime (PCPA Tr. 71–73). Further, Mrs. DiGristine testi-

---

criminal case may have the obligation to permit his client or a member of his client's family such as a spouse or parent to testify as he desires, notes (at 28) that the answer may well be different as to "collateral witnesses". For further discussion of these problems, *see* "Symposium on Professional Ethics", 64 Mich.L.Rev. 1469 (1966).

6. Trial counsel has stated: " * * * He told me he dropped the flashlight at the crime scene." (Tr. 147).

fied on cross-examination as follows upon questioning by the Assistant State's Attorney (PCPA Tr. 76–77):

Q That's right, well, why is that you did not bring up to Mr. Boone about the fact that you were with Cornell that night?

A Because I wasn't aware of anything like this, you know, what happened, you know, if I did not know the date or days about until after he got convicted.

Q I see, you did not realize this?

A No, sir.

Q All right, well, as a matter of fact you did not realize it at the time of the trial?

A Uh-uh.

And subsequently, upon questioning by Judge Jenifer (PCPA Tr. 79), the lady stated:

Q (By the Court) As I understand you weren't sure of the date you were at the, the date Jim spent with you at your home, is that right, at the time you were not sure?

A I was sure he was there, but I cannot connect it.

Q (By the Court) You cannot connect it to the 15th of December, is that right?

A No, I could not connect it to it when he was on trial before.

Mrs. DiGristine's said testimony is consistent with the statements of Cornell's trial counsel during the proceedings in this Court (Tr. 150–51) that before and during trial, trial counsel was not aware that Mrs. DiGristine had any knowledge of where Cornell was on the night of the crime and that Cornell never asked trial counsel to call Mrs. DiGristine as such an alibi witness in his case.

■ Accordingly, even if trial counsel could ethically have presented alibi evidence on behalf of a client who had admitted his guilt to him, since by the time of trial Mrs. Jones had withdrawn her offer of alibi testimony and since although trial counsel had interviewed her the day before trial, Mrs. DiGristine did not tell trial counsel, and indeed seemingly did not herself know, of such testimony, trial counsel's alleged "failure" to offer such testimony hardly adds up to incompetence of any shape, manner or form.

Cornell, however, also charges his trial counsel with incompetence on the grounds that trial counsel failed to introduce evidence at trial to show that the very flashlight which was found at the scene of the crime had been stolen from Cornell three days previously. To that end, one of those witnesses, Mrs. McBride, testified at the post-conviction hearing that she was with Cornell on the evening of December 12 and went with him that evening to the Hazelwood Inn where Cornell parked the car he was driving; that she and Cornell entered the inn and played several games of pool; and that when they came out of the inn after an hour or an hour and a half, she noticed that the car appeared to have been broken into and that a jacket and slacks belonging to her which had been in the car were missing. Mrs. McBride testified during the post-conviction hearing that Cornell began looking through the car and then told her (Mrs. McBride) that the flashlight had been stolen. Mrs. McBride, however, testified that she herself has never seen the flashlight. (PCPA 52–55).

Additionally, during the post-conviction proceeding, the sworn statements of two police officers concerning Cornell's statements about the theft of the flashlight were admitted into the record.

Since, as discussed *supra*, Cornell had admitted to his trial counsel before trial that he (Cornell) had dropped the flashlight which was found at the scene of the crime while he was committing the crime, Cornell's trial counsel was seemingly faced with somewhat of a dilemma in terms of presenting evidence as to the theft of a flashlight from Cornell with the attendant implication that it was the flashlight in which was found, apparently on the Adams property, a battery

bearing Cornell's fingerprint. Nonetheless, apparently assuming that the witnesses were not committing perjury, Cornell's trial attorney attempted to enter evidence on this point. The strongest possible testimony that trial counsel could have perhaps presented would have been that of Mrs. McBride to the effect that she was with Cornell the night the flashlight was allegedly taken, although that lady admitted having no independent knowledge that there had been any flashlight in the car before the vehicle was broken into. But at best, Mrs. McBride would seemingly have been a rather questionable witness for trial counsel to put on the stand. To begin with, Mrs. McBride had a prior criminal record. (Trial counsel's testimony in this Court, Tr. 134). Further, on one occasion she had arrived in trial counsel's office "in a complete state of disarray". (Trial counsel's testimony in this Court, Tr. 134). Additionally, "she didn't make too much sense". (Trial counsel's testimony in this Court, Tr. 135). Against that background, trial counsel testified in this Court that since Mrs. McBride did not appear at the trial and since in any event he "did not want that woman to testify in his case because [he] was afraid of the impact it might have on Judge Raine" (Tr. 135), trial counsel instead made a proffer to Judge Raine of what Mrs. McBride's testimony would have been (Tr. 50–51):

THE COURT: All right, in 3189, State vs James Cornell, the State has closed. The defendant took the stand to say that he elected not to testify and then the Court recessed. Now, there was another witness you intended to call, Mr. Boone?

MR. BOONE: Yes, your Honor. I had not intended to call her as a witness. She has been personally involved with this case ever since I first got into it and it was my judgment and decision not to call her as a witness; however, my client, Mr. Cornell, felt that her testimony might be germane to the situation and I would like to make a proffer as to what her testimony would be had she come and were she here.

THE COURT: What do you expect her to testify to?

MR. BOONE: She would say that on December 15, 1969, at approximately 7 o'clock,—

MISS GOLDBERG: Your Honor, I object.

THE COURT: This is just a proffer.

MR. BOONE: That she was with the defendant, Cornell, at the Hazelwood Inn and that when they returned to the car around that time the defendant and she noticed that the car had been broken into and the stero [sic] tape deck had been disturbed, a jacket was stolen from the car, that she knew of, and a flashlight and some stero [sic] tapes, and that would be the extent of her testimony.

THE COURT: And that was on December the 15th about 7 o'clock?

MR. BOONE: Approximately 7 o'clock.

THE COURT: And was that breaking into and larceny from the automobile, was that reported to the police, would she know?

MR. BOONE: It's my understanding that they went back inside the Hazelwood Inn and mentioned it to one of the employees there and thereafter, the car belonging to the defendant's father, they didn't want to make an insurance claim, they were worried about their rates going up, so, they didn't report it at all. That would be the defendant's case, your Honor. Renew our motion for judgment of acquittal.

THE COURT: The motion will be overruled.

MR. BOONE: That's the defendant's case.

That was an accurate recital of what Cornell claims Mrs. McBride was willing to testify to except for the fact that

the proffered date was December 15, 1969, i. e., the date of the Adams burglary, instead of December 12, 1969, i. e., the date Cornell alleges that the flashlight was stolen. It is possible that Cornell's trial counsel was originally misled on this point by Cornell himself. During Cornell's testimony in his post-conviction proceeding, Cornell on redirect examination, was examined by his own counsel as follows (PCPA Tr. 48):

Q How do you explain the discrepancy between the fifteenth and twelfth?

A I believe I originally told him [trial counsel] it was the fifteenth, because I was mixed up on the days. I was not sure about the dates.

Q But were you definite to him that it was before the robbery, before the burglary?

A I believe so.

It is not possible to determine with any certainty from his oral opinion how Judge Raine interpreted the proffer. Commenting thereon, Judge Raine noted (T. Tr. 52–53):

\* \* \* Now, there was a proffer of testimony that at the Hazelwood Inn at 7 o'clock a flashlight was stolen from this defendant's car. It is significant that there was no report made of that theft and even if that witness had appeared and testified the Court would not have accepted her bald statement to that effect. \* \* \*

It must of course be borne in mind that Cornell before trial had already admitted to his trial counsel that he himself had dropped the flashlight while perpetrating the crime. It is also to be noted that the proffer apparently exceeded what Mrs. McBride herself could have testified to, since the proffer implied that Mrs. McBride herself had some independent knowledge of the disappearance of the flashlight rather than having simply heard Cornell say that that item was missing.[7]

■ Further, there is no indication in the record that Cornell or anyone else ever identified *the* flashlight which was found at the scene of the crime as the one that was allegedly taken from the car Cornell is said to have parked at the Hazelwood Inn three days earlier. Cornell's trial counsel testified that no one ever told him that they could identify the two flashlights (PCPA Tr. 164, 178). However, Cornell's father testified that he could have identified the flashlights and that he so informed his son's trial counsel during the trial (PCPA Tr. 133). This Court finds trial counsel's testimony to be more credible and accepts his account as to what occurred. Finally, it appears that Judge Raine was in fact made aware of the precise details of Cornell's contention about the flashlight subsequent to the trial. As mentioned *supra*, after the trial, Cornell's trial counsel met with Judge Raine in chambers and apparently presented to Judge Raine a number of affidavits [8] in which certain persons stated that Cornell had told them before December 15, 1969 that a flashlight had been taken from the car at the Hazelwood Inn. Judge Raine did not order a new trial but did, for reasons which the record does not disclose, reduce Cornell's sentence from eighteen to eight years of confinement.[9] In sum, therefore, trial counsel was presented with a complicated ethical and tactical problem as well as a possible hearsay problem in terms of the truth of what Mrs. McBride would have testified Cornell told her as to the alleged theft of the flashlight. Trial counsel seemingly tried to handle the matter by means of the proffer at trial and later by the presentation of affidavits to the trial judge. Rather clearly, trial counsel's said efforts, even if it be assumed, *arguendo* only, that they are

---

7. Mrs. McBride's testimony directed toward proving that any flashlight had been stolen from the automobile on December 12, 1969 would seem to have been subject to objection as hearsay.

8. Those affidavits are in the official court file in Civil No. 72–1220–K.

9. *See* n. 1 *supra* and PCPA Tr. 166–69.

at all open to hindsight-type criticism, are a far cry from representation which is constitutionally inadequate. *See* Miller v. Cox, 457 F.2d 700, 701 (4th Cir.), cert. denied, 409 U.S. 1007, 93 S.Ct. 433, 34 L.Ed.2d 299 (1972), *quoting from* Root v. Cunningham, 344 F.2d 1, 3 (4th Cir.), cert. denied, 382 U.S. 866, 86 S. Ct. 135, 15 L.Ed.2d 104 (1965).

■ The same is true of Cornell's complaint that his trial counsel should have more closely questioned Adams as to the discrepancy between Cornell's height of approximately 5′ 7″ and the height that Adams ascribed to the burglar when originally questioned by the police, *i. e.*, 6′. Cornell's trial counsel did cross-examine Adams about his identification of Cornell as the burglar (T. Tr. 14–15) and got Adams to concede that it was possible that he was mistaken as to the identification. While further questioning specifically directed at that discrepancy might have been helpful, Cornell's trial counsel may well have thought that it would not be wise for him further to cross-examine (Tr. 160). Such a tactical decision provides no basis for a determination that Cornell was unconstitutionally deprived of the effective assistance of counsel.

### Civil No. 73–215–K

In this case, Cornell seeks habeas corpus relief in the form of a transfer out of Patuxent and back to the Department of Correction alleging that he was held in diagnostic status for more than six months at Patuxent without any diagnostic report concerning him being filed and therefore is being held in violation of 3 Md.Ann.Code art. 31B, § 7(a) [10] (1973 Cum.Supp.). But Cornell, as of this date, is not being held at Patuxent prior to a determination of defective delinquency. As of this time, and since his defective delinquency trial before Judge Turnbull on November 22, 1972, Cornell is being and has been held at Patuxent pursuant to 3 Md.Ann.Code art. 31B, § 9(b)[11] as a defective delinquent.

---

10. That section provides:
(a) *By whom made; report of findings to court; time spent in institution, etc., credited on sentence.*—Any such examination shall be made by at least three persons on behalf of the institution for defective delinquents, one of whom shall be a medical physician, one a psychiatrist, and one a psychologist. They shall assemble all pertinent information about the person to be examined, before proceeding therewith, including a complete statement of the crime for which he has been sentenced, the circumstances of such crime, the court in which he was sentenced, the nature of the sentence, copies of any probation or other reports which may have been made about him, and reports as to his social, physical, mental and psychiatric condition and history. On the basis of all the assembled information, plus their own personal examination and study of the said person, they shall determine whether in their opinion, or in the opinion of a majority of them, the said person is or is not a defective delinquent. They shall state their findings in a written report addressed to the court, not later than six months from the date said person was received in the Institution for examination, or three months, before expiration of his sentence, whichever first occurs. If the substance of the report is that the said person is not a defective delinquent, he shall be retained in the custody of the Department of Correction under his original sentence as if he had not been examined for possible defective delinquency. Provided, however, that the said person shall be returned to the custody of the Department of Correction with full credit for such time as he has already spent in the institution for defective delinquents or within the custody of the Department of Correction including such allowances (or disallowances) relating to good behavior and/or work performed as the Board of Correction may determine under the provisions of § 688 of Article 27 of the Code.

11. That section provides:
(b) *When defendant found to be a defective delinquent.*—If the court or the jury, as the case may be, shall find and determine that the said defendant is a defective delinquent, the court shall so inform the defendant, and shall order him to be committed or returned to the institution for confinement as a defective delinquent, for an indeterminate period without either maximum or minimum limits. In such event, the sentence for the original criminal conviction, or any unexpired portion thereof, shall be and remain suspended, and the defendant shall no longer be confined for any portion of said original sentence, except as otherwise provided herein. Instead, the defendant shall thenceforth remain in the custody of the institution for defective delinquents, subject to the provisions of this article.

In Director v. Cash, 269 Md. 331, 341, 305 A.2d 833 (1973), Maryland's highest Court has held that the language in section 7(a) is directory and not mandatory and that therefore a non-cooperating person may be kept in diagnostic status at Patuxent for more than six months. Cash was decided after McNeil v. Director, 407 U.S. 245, 250, 92 S.Ct. 2083, 2087, 32 L.Ed.2d 719 (1972), in which Mr. Justice Marshall wrote:

* * * "[D]ue process requires that the nature and duration of commitment bear some reasonable relation to the purpose for which the individual is committed." [Jackson v. Indiana, 406 U.S. 715, 738, 92 S.Ct. 1845, at 1858, 32 L.Ed.2d 435 (1972).] Just as that principle limits the permissible length of a commitment on account of incompetence to stand trial, so it also limits the permissible length of a commitment "for observation." We need not set a precise time limit here; it is noteworthy, however, that the Maryland statute itself limits the observation period to a maximum of six months. While the state courts have apparently construed the statute to permit extensions of time, see n. 2, supra, nevertheless the initial legislative judgment provides a useful benchmark. In this case it is sufficient to note that the petitioner has been confined for six years, and there is no basis for anticipating that he will ever be easier to examine than he is today. In these circumstances, it is a denial of due process to continue to hold him on the basis of an ex parte order committing him for observation.

In McNeil, as Mr. Justice Marshall specifically noted (at 252, 92 S.Ct. 2083), McNeil had been held at Patuxent "for observation" after his original five-year sentence had expired.

█ Even if it be assumed arguendo that there is any indication in the McNeil opinion which is at odds with the interpretation of the Court of Appeals of Maryland in Cash, and that Cornell, as one held at Patuxent for more than six months before his defective delinquency trial took place, has a cause for complaint, that question need not be reached herein. Pursuant to 3 Md.Ann.Code art. 31B, § 10(a) (1971 Repl. Vol.), which provides that a person confined at Patuxent may seek an initial redetermination of his defective delinquency status after both two years and two thirds of the original sentence of confinement have been served, Cornell, having been sentenced to eight years' imprisonment beginning on February 13, 1970, has seemingly been entitled to such a redetermination hearing since April 13, 1975, according to written information provided to this Court by counsel herein for the State. If this Court were at this time to grant Cornell's habeas corpus quest in Civil No. 73–215–K and to order Cornell transferred to another Maryland institution because his commitment at Patuxent has been or is in some sense improper,[12] the Maryland Department of Correction apparently might immediately request that Cornell be examined for defective delinquency even though he had already served a large portion of his sentence since he is not yet within six months of the expiration thereof. See 3 Md.

12. This Court has been informed by counsel for defendants in these cases that it is the practice of the Department of Correction of Maryland to give prisoners transferred from Patuxent equal good time and work credit as if they had spent an equal amount of time in the custody of the Department of Correction. Further, see 3 Md.Ann.Code art. 31B, §§ 9(a), 13(f) and 16(c). Sections 13(d) and (e) would appear to give Patuxent inmates roughly the same eligibility for leaves of absence, parole and outside employment as are provided prisoners in the custody of the

Department of Correction. See Clark v. Director, Civil No. 20521–N (D.Md. Oct. 16, (1972), a copy of which has been placed in the official court file in Civil No. 73–215–K. Cf. Carafas v. LaVallee, 391 U.S. 234, 237, 88 S.Ct. 1556, 20 L.Ed.2d 554 (1968). But these are questions which need not be reached in these cases. Nor need the issue of whether a person improperly detained at a Patuxent-type institution may complain meritoriously on a constitutional level of intangible and other alleged effects be further considered herein.

Ann.Code art. 31B, § 6(c) (1973 Cum. Supp.).[13] Since counsel for both sides have agreed, and seemingly appropriately so, that the burden of proof and all other relevant standards and procedures are identical in hearings involving original defective delinquency determination and in redetermination hearings, nothing would be gained should this Court order Cornell to be transferred from Patuxent, or else to be released, since the state confinement authorities could seemingly comply with such order by transferring Cornell from Patuxent and then immediately seek to return Cornell to Patuxent for reexamination for a new determination.[14]

### Civil No. 73-495-K

In this case, Cornell seeks a declaratory judgment as to the illegality of his current confinement at Patuxent and a transfer to another confinement institution. Additionally, he seeks $4000 in compensatory damages from each of four named defendants. To the extent that Cornell seeks transfer out of Patuxent

as a result of the allegedly inaccurate testimony entered at his defective delinquency determination hearing, what this Court has written *supra* in connection with Civil No. 73-215-K with respect to the availability of a *de novo* defective delinquency hearing applies equally with respect to Civil No. 73-495-K.

Cornell's sole allegations of inaccurate evidence concern two portions of the "Diagnostic Staff Report" prepared by the Patuxent staff, signed by each of the defendants in Civil No. 73-495-K and submitted to the jury by the State during Cornell's defective delinquency determination hearing (D.D. Tr. 18).[15] The first challenged portion is on the first page of that report which reads in part:

* * * In addition, during his time in the Army, he [Cornell] received three court martials, all for stealing. * * *

In fact, as Cornell contends and as is set forth in one of the documents from Cornell's military file which is included

---

13. That section provides:

(c) *When requests may be made.*—Such an examination may be requested and made at any time after the person has been convicted and sentenced for a crime or offense specified hereinabove in this section, provided that the said person has been sentenced to a period of confinement in a penal institution or is then serving such a sentence. No such examination shall be ordered or made if the said person has been released from confinement for the particular crime or offense of which he was convicted or who is within six months of the expiration of his sentence.

14. *See* the discussion at p. 1104 *supra* with regard to entitlement to an initial redetermination hearing of a person confined at Patuxent. Such a person has the right to have redetermination hearings, after his initial redetermination hearing, not more frequently than once every three years. *See* 3 Md.Ann.Code art. 31B, § 10(b). In Feldman v. Boslow, Civil No. 72-946-H (D.Md. June 26, 1973), the question was presented as to whether that latter provision was violative of due process and equal protection principles. As to equal protection, the opportunity of a civil committee under Maryland law to obtain a hearing at least once each year was stressed. Judge Harvey held that the

plaintiff's statutory entitlement to a redetermination hearing as of the time Judge Harvey filed his Memorandum and Order in *Feldman* prevented him from reaching what Judge Harvey characterized (at 6) as "an important question of constitutional law". A copy of the *Feldman* opinion has been placed in the official court file in Civil No. 73-215-K. *See also* Carter v. Watts & Boslow, Civil No. W-74-1136 (D.Md. filed Oct. 15, 1974 and presently pending before a statutory three-judge Court).

15. In the course of the preparation of opinions in these three cases, it was necessary for this Court to request the State to provide a transcript of Cornell's defective delinquency determination hearing which transcript had not earlier been so provided. Until that transcript was so received, this Court did not foreclose the possibility of holding an evidentiary hearing in Civil No. 73-495-K. However, after receipt and review of that transcript, this Court has determined that no such hearing is necessary. In that connection it is also noted that Cornell has been afforded the opportunity to submit any documents or affidavits which he desired in connection with Civil No. 73-495-K as well as in Civil Nos. 72-1220-K and 73-215-K, and, in fact, did in the very recent past submit a number of such documents.

in the official court file in Civil No. 73–495–K, Cornell received one general court martial while in the Army on three specifications of three separate thefts. That information in that said document is set forth in the following format:

Convictions by courts-martial:

| Type | Offense | Approved Sentence |
|---|---|---|
| General | Did steal articles of a aggregated value of about $45.00 | |
| | Did steal articles of a aggregated value of about $49.60 | |
| | Did steal a camera with leather case of a value of about $20.00 | |

During Cornell's defective delinquency hearing, defendant Murray, a Patuxent psychologist who had examined Cornell, referred to Cornell's military record at only three places. The first of those references was in connection with the prosecutor's question (D.D. Tr. 19) concerning what information was contained among Cornell's records at Patuxent. *Inter alia,* Murray referred (D.D. Tr. 20) to Cornell's "crime in the service". Later, in answer to a question as to whether Cornell had an emotional unbalance, Murray referred (D.D. Tr. 23) to the fact that Cornell "got in trouble in the armed services". Further (at D.D. Tr. 25), in answer to a question concerning whether Cornell had a history of anti-social and criminal behavior, Murray testified:

* * * He next got into difficulty while he was in the armed services, I think there were several accounts of stealing, he received a court martial, and I think was sentenced to eighteen months to two years in the stockade.
* * *

All of that testimony by Murray was accurate. Against that background, if there was error in admitting the inaccurate report, any such error was harmless beyond a reasonable doubt and therefore could not provide any basis for habeas corpus or equitable relief. *See* Harrington v. California, 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969); Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). The factual error in the report is not only understandable, but could in no way have misled the jury as to the *facts* concerning Cornell's military record and *the fact* that that record reflected convictions for three separate thefts. Insofar as Cornell seeks monetary damages as a result of the above-described inaccuracy in the report, although the harmless error doctrine may well not be specifically applicable, the minor nature of the inaccuracy demonstrates that Cornell was neither prejudiced nor damaged by it.

Cornell also points to the second page of the "Diagnostic Staff Report" which reads in part:

* * * An electroencephalogram was done, however, the results have not yet been recorded.

Cornell contends, seemingly correctly, that in fact no electroencephalogram was ever done on him. However, even if—as seems doubtful—Cornell could have been prejudiced if such an inaccurate statement had gone unchallenged, in fact that statement was corrected during Cornell's defective delinquency determination hearing. At the conclusion of the State's case, the following colloquy took place in the presence of the jury among Cornell's counsel (Mr. Glass) and counsel for the State (Mr. Howell) (D.D. Tr. 45–46):

MR. GLASS: Your Honor, we have one other item, the State has stipulated that the record shows he was given an electroencephalogram, and the result has not yet been reported in the report, and Dr. Boslow had written a letter stating that no electroencephalogram had been given.

MR. HOWELL: Your Honor, I will stipulate that no electroencephalogram examination was given Mr. Cor-

nell; but, of course, Mr. Murray didn't testify that it had.

MR. GLASS: It is my understanding that the report was entered into evidence that it was, it was stated in the report, though; isn't that correct?

MR. HOWELL: That is true.

Clearly therefore the jury at Cornell's defective delinquency determination hearing was left under no misapprehension as to the electroencephalogram. Therefore, the inaccuracy in the "Diagnostic Staff Report" about that test provides no basis for any habeas corpus or equitable relief nor does it provide any basis for any claim for monetary damages.

The relief sought by Cornell in both Civil Nos. 73–215–K and 73–495–K includes, as indicated, Cornell's desire to be transferred out of Patuxent. As such the issues so raised herein seemingly are not appropriate subjects for post-conviction relief. *See* Gee v. Director, 513 F.2d 814 (4th Cir. 1975); Jones v. Director, No. 13041 (4th Cir. Aug. 13, 1969); Towers v. Director, 16 Md.App. 678, 299 A.2d 461 (1973); Creswell v. Director, 2 Md.App. 142, 233 A.2d 375 (1967). *See also* Hudson v. Superintendent, 11 Md.App. 253, 273 A.2d 470 (1971). Accordingly, even though those questions have apparently not been exhausted in the state courts, they need not be so exhausted and are considered *supra* herein on the merits. In that context, there is of course no need for this Court to delay consideration on the merits of Cornell's claims for damages in Civil No 73–495–K. *Cf.* Wolff v. McDonnell, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935, 949–50 (1974); Preiser v. Rodriguez, 411 U.S. 475, 93 S.Ct. 1827, 36 L.Ed.2d 439 (1973).

For the reasons set forth hereinabove, Cornell's quests for relief in these three cases are hereby denied.[16]

---

16. During one of the hearings in these cases, the question arose as to whether Cornell desired to claim a violation of his due process and/or equal protection rights on the same bases stated by four plaintiffs in Dower v. Director, 396 F.Supp. 1070 (D.Md.1975) and three other related cases filed in this Court. Therein, the question is raised as to whether in a defective delinquency determination hearing, the "preponderance of the evidence" standard is unconstitutional, and must be replaced by a higher standard.

Cornell, as noted *supra* at p. 1094, was determined to be a defective delinquent on November 22, 1972. In an opinion in *Dower*, being filed on the same date as this opinion, this Court has denied relief to three plaintiffs who were determined to be defective delinquents before October 1, 1973 and has granted relief to one plaintiff who was determined to be a defective delinquent after that date. Cornell falls within the same classification as the three said unsuccessful plaintiffs in *Dower*. Accordingly, he is not entitled to relief upon the grounds raised by the plaintiffs in *Dower* for the reasons stated in this Court's opinion therein. In that connection it is noted that Cornell withdrew his *Dower*-type contention because he did not desire that this Court's resolution of the other contentions Cornell has raised in the within three cases be delayed awaiting this Court's filing of its opinion in *Dower*. As it has turned out, this Court's opinions in the *Cornell* and *Dower* cases are being filed on the same date. Cornell may, by advising this Court in writing, on or before May 27, 1975, that he so requests, have his *Dower*-type claim automatically and forthwith reinstated in these cases without any further Order by this Court. That claim, however, assuming it is reinstated by Cornell, is hereby denied for the reasons set forth in this Court's opinion in *Dower* and in the within footnote. Cornell, as indicated *supra* in the body of this opinion, is currently entitled to a redetermination hearing as to his defective delinquency. That entitlement seemingly also exists as to one of the three unsuccessful plaintiffs in *Dower* but not apparently as to the other two unsuccessful plaintiffs therein. Pursuant to this Court's opinion in *Dower*, Cornell in any such new redetermination hearing would be entitled to the benefit of the "clear and convincing" evidence standard.